*This opinion is subject to revision before final publication in the Pacific Reporter*

**2013 UT 42**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DEBRA BROWN,
*Appellee and Cross-appellant,*

*v.*

STATE OF UTAH,
*Appellant and Cross-appellee.*

Nos. 20110481, 20110141
Filed: July 12, 2013

Second District, Ogden Dep't
The Honorable Michael D. DiReda
No. 100903670

Attorneys:

John E. Swallow, Att'y Gen., Patrick B. Nolan, Scott W. Reed,
Christopher D. Ballard, Asst. Att'ys Gen., Salt Lake City,
for appellant and cross-appellee

Alan L. Sullivan, Christopher Martinez, Elizabeth Fasse,
Christine R. Poleshuk, Salt Lake City, for appellee and
cross-appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE DURHAM, and
JUSTICE PARRISH joined.

JUSTICE LEE filed a dissenting opinion.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1     In 1995, a jury convicted Debra Brown for the murder of Lael
Brown. Fourteen years later, in 2009, Ms. Brown filed a petition for
a post-conviction determination of factual innocence pursuant to
Utah's Post-Conviction Remedies Act (PCRA).[1] The post-conviction

---

[1] Ms. Brown also asserted claims for post-conviction relief under
Part 1 of the PCRA. The State moved for summary judgment on

(continued...)

court granted Ms. Brown's petition and held an evidentiary hearing. The court interpreted Part 4 of the PCRA to allow its determination of factual innocence to be based on a combination of newly discovered evidence and previously available evidence. It then, based on the evidence Ms. Brown presented at her factual innocence hearing, determined that Ms. Brown established her factual innocence by clear and convincing evidence. It therefore vacated her 1995 murder conviction, and the State appealed.

¶2    We affirm the post-conviction court. We hold that a post-conviction determination of factual innocence can be based on both newly discovered evidence and previously available evidence. Further, because the State did not properly challenge the post-conviction court's factual findings, we affirm the post-conviction court's ultimate determination that Ms. Brown is factually innocent.

## BACKGROUND

¶3    On Sunday, November 7, 1993, Ms. Brown told police that she discovered her long-time employer Lael Brown (Lael) dead in his bed.[2] Lael had been shot in the head three times. Ms. Brown told police that Lael had been feeling sick and that she had delivered soup to him the day before. She claimed that Lael did not answer his door at the time, so she left the soup on his doorstep. She further claimed that she discovered the soup was still sitting on Lael's doorstep the next day. She stated that when Lael again did not answer his door, she used a key Lael had given her to let herself into his house where she discovered his body.

*A. The 1995 Trial*

¶4    On September 9, 1994, police arrested Ms. Brown and charged her with Lael's murder. At Ms. Brown's 1995 trial, the State presented a circumstantial case that largely depended on Ms. Brown's inability to offer an alibi during the time the State argued Lael must have been murdered. First, the State presented evidence showing no signs of forced entry into Lael's home. The

---

[1] (...continued)
those claims, and the post-conviction court granted the State's motion. Ms. Brown filed a cross-appeal to us challenging the court's grant of summary judgment. Because we affirm the post-conviction court's determination of Ms. Brown's factual innocence, we do not reach Ms. Brown's cross-appeal.

[2] Lael Brown and Debra Brown are not related.

State claimed Lael always locked his doors and that the front door locked automatically. Further, the State offered evidence that Ms. Brown had access to Lael's house. She had been in his home on previous occasions to clean and paint and had one of only two known keys to Lael's house. The second key belonged to Lael and was found on his key ring.

¶5 The evidence at trial also showed that Lael was shot with a .22 caliber handgun. An expert testified that the murder weapon could have been Lael's Colt Woodsman, which was missing from Lael's home after the murder. Testimony indicated that Lael was seen alive Friday evening but was not seen following his usual routine of drinking coffee at Angie's Restaurant on Saturday morning. Lael did not answer his phone on Saturday, and no one saw him working around his house, even though his truck was parked at home. Lael also did not return Saturday to finish repairs for a tenant that he had started the evening before.

¶6 The medical examiner, Dr. Grey, testified at trial that, based solely on the physical evidence, Lael was likely murdered between 9:00 p.m. on Saturday, November 6, and 3:00 a.m. on Sunday, November 7. Dr. Grey also testified that "association factors," like Lael's regular routine and the time he was last seen alive, could expand the time-of-death estimate beyond what the physical evidence suggested. Based on these factors, Dr. Grey agreed that Lael could have been murdered between Friday evening, when Lael was last seen alive, and Sunday morning.

¶7 Ms. Brown accounted for her whereabouts during the time Lael could have been murdered, except for a period between 6:40 a.m. and 10:00 a.m. on Saturday, November 6. At about 6:40 a.m., Ms. Brown left her then-boyfriend's house after spending the night. And at around 10:00 a.m., Ms. Brown's son saw her making soup. The State put on evidence that Lael's neighbor, Paulette Nyman, heard two gunshots on Saturday at about 7:00 a.m.

¶8 Finally, the evidence at trial showed that the only property missing from Lael's home after his murder was his wallet, his .22 caliber Colt Woodsman, his October bank statement, and canceled checks from October and previous months. Copies of the bank statement and canceled checks later showed that several checks were made payable to Ms. Brown, but these checks had apparently been forged.

*B. The Appeal*

¶9 A jury convicted Ms. Brown of aggravated murder. In 1996,

she appealed her conviction to us. She challenged, among other things, the sufficiency of the evidence the jury relied on to convict her.[3] We recognized that there was no direct evidence tying Ms. Brown to the murder and that the State's case against her was entirely circumstantial.[4] We noted that a large part of the State's circumstantial case was Ms. Brown's inability to offer an alibi during the time the State argued Lael must have been murdered.[5] But we also recognized that a jury can base its verdict on sufficient circumstantial evidence.[6] Specifically, we concluded that the jury, based on the evidence available, could have drawn the following reasonable inferences: First, because there were no signs of forced entry, the jury could have inferred that Lael's murderer likely gained access to his house by key and shot Lael while he was asleep in bed.[7] Second, because the medical examiner testified to a time of death between 9:00 p.m. on Friday and 3:00 a.m. on Sunday and a neighbor testified to hearing gunshots at 7:00 a.m. on Saturday, the jury could have inferred that Lael was murdered at 7:00 a.m. on Saturday.[8]

¶10   Third, because Lael's gun, which was the same caliber as the murder weapon, was missing, the jury could have inferred that the murderer used Lael's gun to shoot Lael.[9] Fourth, because Ms. Brown had been in Lael's home to clean, the jury could have inferred that she knew where Lael kept his gun and financial papers.[10] Fifth, because the only things missing from Lael's house were his wallet, gun, and October bank statement, the murderer likely had a personal interest in that property and, due to her forgeries, the jury

---

[3] *State v. Brown (Brown I)*, 948 P.2d 337, 340 (Utah 1997).

[4] *Id.* at 344.

[5] *See id.* at 339–40 (noting that "[o]n the basis of a neighbor's statement about hearing gunshots, police thought the murder occurred at approximately 7:00 a.m. on Saturday, November 6, 1993. [Ms. Brown] could account for her whereabouts for the entire weekend except the hours between 6:40 a.m. and 10 a.m. on Saturday, November 6").

[6] *Id.* at 344.

[7] *Id.* at 345.

[8] *Id.* at 345–46.

[9] *Id.* at 346.

[10] *Id.*

could have inferred that Ms. Brown had such an interest.[11] Sixth, Ms. Brown gave inconsistent statements concerning her reason for leaving soup on Lael's doorstep, and the jury could have wondered why, given that she had a key, she did not put the soup inside.[12]

¶11 Seventh, the defense could not account for Ms. Brown's whereabouts around 7:00 a.m. when gunshots were heard, but the defense could account for her whereabouts prior to 6:40 a.m. and after 10:00 a.m. on Saturday.[13] Finally, because the murderer likely entered by key, and only Lael and Ms. Brown were known to have keys to Lael's house, the jury could have inferred that Ms. Brown was the murderer.[14] Based on these reasonable inferences, we determined that the evidence was sufficient to support Ms. Brown's conviction for Lael's murder.[15]

*C. Post-Conviction Proceedings*

¶12 In 2002, the Rocky Mountain Innocence Center (RMIC) began investigating Ms. Brown's conviction. In 2009, based on new evidence that the RMIC believed challenged the State's circumstantial case, Ms. Brown petitioned the post-conviction court for relief. She filed a petition for post-conviction relief under Part 1 of the PCRA and a petition for post-conviction determination of factual innocence under Part 4 of the PCRA.

¶13 In her petition under Part 1 of the PCRA, Ms. Brown made five claims for relief.[16] The State moved for summary judgment on each of those claims, arguing that summary judgment was proper because Part 1 of the PCRA either foreclosed her requested relief or her claims were untimely under Part 1's statute of limitations.

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] First, she claimed that newly discovered evidence establishes her factual innocence. Second, she claimed that newly discovered evidence establishes that no reasonable juror could have found her guilty of Lael's murder. Third, she claimed her conviction violated due process due to an inadequate police investigation. Fourth, she claimed her conviction violated due process because police withheld exculpatory evidence. Finally, she claimed her trial and appellate counsel provided ineffective assistance.

Ms. Brown disputed that her claims were time-barred and argued alternatively that the PCRA's statute of limitations is unconstitutional because it does not have an "interests of justice" exception. The post-conviction court ultimately granted the State's motion for summary judgment and found the PCRA's statute of limitations to be constitutional.

¶14 Next, in response to Ms. Brown's petition for a post-conviction determination of factual innocence under Part 4 of the PCRA, the State filed a motion to dismiss on May 11, 2009. The post-conviction court denied the State's motion, however, because it found that "a bona fide issue does exist as to whether [Ms. Brown] is factually innocent." After discovery, the post-conviction court held an evidentiary hearing on January 18–24, 2011.

¶15 At the January 18–24 hearing, Ms. Brown presented evidence that she characterized as newly discovered. First, she presented evidence "challenging the State's theory that she was the only person who had a motive to kill Lael." This evidence showed that Lael did not discover Ms. Brown's forgeries before his murder. It also showed that bank statements from months other than October were missing from Lael's home. Further, the evidence showed that Lael's former tenant, Bobbie Sheen, was angry that Lael had evicted him.

¶16 Second, Ms. Brown presented evidence "challenging the State's theory that she was the only person who had access to Lael's home." This evidence showed that people other than Ms. Brown had a key to Lael's house. It also showed that Lael's house was not as secure as previously represented—"the front and back doors to Lael's house were not secure," and "the bathroom window could be opened."

¶17 Third, Ms. Brown presented evidence that Bobbie Sheen "was the likely perpetrator of the homicide and, therefore, that the State's theory that she was the only possible person who could have committed the murder was erroneous." This evidence showed that police "failed to investigate Sheen even though the police knew he was a possible suspect." It also showed that Sheen may have been in possession of cash and a gun similar to the murder weapon after Lael's death. Further, Ms. Brown presented evidence "that police failed to collect or analyze important evidence at the crime scene."

¶18 Finally, Ms. Brown presented evidence challenging the State's theory that Lael's murder occurred at 7:00 a.m. on Saturday, November 6. Paulette Nyman, Lael's neighbor, testified at trial that

she heard gunshots Saturday morning. But at the January 18–24 hearing, she testified "that she was not sure when she heard gunshots but that it was on the same day there was police activity at Lael's house, which would have been on Sunday, November 7th."

¶19 The post-conviction court concluded that the evidence Ms. Brown presented in the January 18–24 hearing did not establish factual innocence. The court stated that, while her new evidence "raises doubts about the State's circumstantial case against her," it does "not establish that she did not engage in the conduct for which she was convicted." The court noted that "at best this evidence raises doubts about the State's theory, but it does not affirmatively establish . . . that [Ms. Brown] was not the one who entered Lael's home on the morning of November 6th or that she did not, in fact, cause Lael's death."

¶20 On January 26, 2011, the post-conviction court held a conference call with the parties and indicated a willingness to reopen Ms. Brown's factual innocence case. The court expressed a concern with two pieces of evidence that suggested Lael had been seen alive later in the day on Saturday, November 6. After subsequent investigation by the parties, the court scheduled a second evidentiary hearing for March 7, 2011.

¶21 Three witnesses testified at the March 7 hearing. First, Lael's friend, Mr. Delwin Hall, testified that he saw Lael at Angie's Restaurant just before Mr. Hall went to work at 2:30 p.m. on Saturday, November 6. Mr. Hall testified that he saw Lael conversing with an unknown man at the counter by the cash register. Mr. Hall stated that he saw Lael's face. Mr. Hall did not want to interrupt so he sat at the other end of the counter without talking to Lael. Mr. Hall also testified that he saw Lael and the other man leave Angie's. Finally, Mr. Hall testified that he gave a statement to a detective at the time of the murder. The detective's case information sheet recorded Mr. Hall's statement as follows:

> Del is a friend/coffee drinking buddy of Lael's from Angie's. Dell related that he saw Lael Friday night at Angies and also Saturday, 11-6-93 at approx. 1430 hours in Angies. Dell is sure of the time, because he was stopping in Angie's before going to work at albertson at 1500 hours.

¶22 Second, another friend of Lael's, Mr. Terry Carlsen, testified that he saw Lael with his son Mike at Angie's on Saturday, November 6 between 7:15 p.m. and 7:45 p.m. Mr. Carlsen saw Lael

and Mike enter the restaurant and sit at the end of the counter. Mr. Carlsen was sure about the time because the next day a friend came to inform him that Lael had been murdered. At that time, Mr. Carlsen remembered thinking that he had just seen Lael the night before. Mr. Carlsen also admitted, however, that Ms. Brown is a friend of his and that he has had some contact with her since her conviction.

¶23 Third, Lael's son Mike testified for the State. He testified that he saw Lael for the last time on November 1 and that he was not with Lael on Saturday, November 6. The State also offered evidence from police case information sheets "of interviews with waitresses from Angie's Restaurant, all of whom stated that they either did not think Lael was at Angie's on Saturday or that they did not remember or did not recall seeing Lael at Angie's on Saturday."[17]

¶24 After hearing the evidence at the March 7 hearing, the post-conviction court first determined that, under Part 4 of the PCRA, it could base a determination of factual innocence "either upon newly discovered material evidence alone or a combination of evidence—as long as the newly discovered material evidence provides at least part of that basis." The court then reviewed Mr. Carlsen's testimony and found that it qualified as newly discovered evidence because at the time of trial Ms. Brown and her counsel were unaware of his testimony. The court also found that Mr. Carlsen's testimony was likely accurate. He was good friends with Lael and would not have mistaken Lael for someone else. Also, Mr. Carlsen likely would not have mistaken the day he saw Lael at Angie's given that a friend informed him of Lael's death the very next day. Finally, Mr. Carlsen's testimony was consistent with Dr. Grey's time of death estimate at trial, which, based on the physical evidence at the time of the autopsy, strongly suggested a time of death beginning at 9:00 p.m. Saturday night until 3:00 a.m. on Sunday.

¶25 The court also found that, although Lael's son Mike testified that he was not with his father at Angie's on Saturday evening and that the last time he saw his father was on Monday, November 1, there were discrepancies in Mike's testimony. He had testified previously that he may have seen his father as late as Thursday and also admitted that he could have had problems with his memory at the time due to alcohol abuse. Thus, the court did not find reason in

---

[17] The waitresses did not testify at the March 7 hearing.

Mike's testimony to doubt the accuracy of Mr. Carlsen's testimony. The court also found that the waitresses' statements from the case information sheets were not necessarily inconsistent with Mr. Carlsen's testimony. One waitress thought she may have seen Lael on Saturday evening, although she was unsure, and the other waitress stated only that she did not see Lael—she did not state definitively that he was not there.

¶26 The court's central concern with Mr. Carlsen's testimony, however, was his credibility. He had previously been convicted of tampering with a witness, and his friendship with Ms. Brown may have provided a motive for him to lie. The court also questioned why it took Mr. Carlsen so long to come forward. The court ultimately concluded that Mr. Carlsen's testimony was "not sufficiently credible to independently establish by clear and convincing evidence that Lael was alive at a time when the State argued he must have been dead."

¶27 Next, the court reviewed Mr. Hall's testimony. It found that his testimony did not qualify as newly discovered evidence because Mr. Hall's name was on a defense witness list at the time of trial. The court recognized, though, that Mr. Hall did not testify at trial and had never testified at any proceeding before the March 7 hearing. The court also found that it was "highly likely" that Mr. Hall testified accurately. And the fact that Mr. Hall gave his statement to a detective on November 10, just days after Mr. Hall claimed to have seen Lael, suggested that Mr. Hall did not mistake the day on which he saw Lael at Angie's. Further, the court found that the waitresses' statements in the case information sheets were not inconsistent with Mr. Hall's testimony. Some of the waitresses were not working at the time Mr. Hall claimed to have seen Lael at Angie's. The other waitresses did not definitively state that Lael was not at Angie's Saturday afternoon.

¶28 The court found that Dr. Grey's time of death estimate bolstered Mr. Hall's testimony. Dr. Grey testified at trial, and again at the January 18–24 hearing, that based on the physical evidence, Lael died at approximately 9:00 p.m. on Saturday evening. The court also concluded that there was no evidence suggesting Mr. Hall was not a credible witness. The only inconsistency in Mr. Hall's testimony was that he originally told the detective that he saw Lael at 2:30 p.m. on Saturday, November 6. But at the March 7 hearing, he testified it would have been closer to 1:00 p.m. The court determined, however, that, given the passage of time, this was not a material inconsistency. The court therefore concluded that Mr. Hall

"testified truthfully about what he saw."

*D. The Post-Conviction Court's Determination of Factual Innocence*

¶29 Based on the above evidence and findings, the post-conviction court made two additional findings. First, the court found "by clear and convincing evidence that Lael Brown was alive Saturday afternoon on November 6, 1993." In making this finding, the court relied principally on Mr. Hall's testimony that he saw Lael at Angie's Saturday afternoon. But in keeping with the court's determination that newly discovered evidence must provide some basis for its determination of factual innocence, it concluded that Mr. Carlsen's testimony provided "some evidence in support of a finding that Lael was alive Saturday afternoon."

¶30 Second, the court found "by clear and convincing evidence that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, have been firmly established." In making this finding, the court made three points. First, "no evidence has ever been presented even suggesting that it was [Ms. Brown] who committed the homicide during [a time period other than Saturday morning]." Second, "one of the specific *facts* set forth by the Utah Supreme Court in its decision on [Ms. Brown's] direct appeal was that she 'could account for her whereabouts *for the entire weekend* except the hours between 6:40 a.m. and 10:00 a.m. on Saturday, November 6.'"

¶31 Finally, the court undertook an "independent assessment of the record" to determine that Ms. Brown's "whereabouts [were] accounted for from 10:00 a.m. Saturday afternoon until Sunday morning at 3:00 a.m." According to the court's account, Ms. Brown's son saw his mother when he awoke around 10:00 a.m. At around 10:20 a.m., Ms. Brown's then-boyfriend, Brent Skabelund, came to take Ms. Brown to her son's basketball game. They left for the game at around 10:45 a.m. At about 12:15 p.m., Mr. Skabelund and Ms. Brown left the game and stopped for lunch at a local drive-in.

¶32 The court further found that Mr. Skabelund then took Ms. Brown home where she took a nap until about 2:00 p.m. For the next hour or so, Ms. Brown delivered soup to Lael's house, possibly delivered soup to her daughter, and went shopping. She then called Mr. Skabelund at about 4:00 p.m. He again picked her up at about 4:30 p.m., and the two of them went grocery shopping. They returned to Ms. Brown's home at about 5:40 p.m., put away the groceries, and had pizza for dinner.

¶33 Finally, the court found that Ms. Brown and Mr. Skabelund

remained together at Ms. Brown's house until about 6:45 p.m., when they left to watch movies at Mr. Skabelund's residence. Ms. Brown fell asleep while watching a movie at about 8:30 p.m. and slept until about midnight. After she awoke, Ms. Brown drove home where she saw her son playing video games. Ms. Brown then went to bed, and her son indicated that she did not leave the house again that night.

¶34 The court based the above assessment of the evidence in part on Ms. Brown's testimony. The court noted that "the manner in which [she] testified and her demeanor on the witness stand did not suggest that she was lying or simply providing self-serving responses." The court thus found that Ms. Brown "testified truthfully at the evidentiary hearing." The court further noted that while Ms. Brown "may have been alone during a portion of the afternoon on Saturday, no evidence has ever been presented establishing that Lael was killed during [this] time period." Finally, the court recognized that, "despite having denied for years that she stole money from Lael, she candidly admitted that she had . . . forged checks belonging to Lael as the State alleged at trial."

¶35 Based on its findings (1) that Lael was alive on Saturday afternoon, November 6 and (2) that Ms. Brown established her whereabouts for the remaining time during which the murder must have occurred, the post-conviction court determined by clear and convincing evidence that Ms. Brown was factually innocent. The court then vacated Ms. Brown's conviction for aggravated murder. The State appealed the post-conviction court's order to us. We have jurisdiction pursuant to section 78A-3-102(3)(I) of the Utah Code.

## STANDARD OF REVIEW

¶36 The post-conviction court interpreted Part 4 of the PCRA to allow it to base its determination of factual innocence on a combination of newly discovered evidence and previously available evidence. "We review a district court's interpretation of a statute for correctness."[18]

¶37 The post-conviction court also concluded that Ms. Brown established her factual innocence by clear and convincing evidence. In making this determination, the post-conviction court made factual findings. "Because a trial court is in a better position to judg[e] credibility and resolv[e] evidentiary conflicts, an appellate court

---

[18] *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 19, 203 P.3d 943.

reviews the trial court's findings of fact for clear error."[19] We will set aside a district court's factual finding as clearly erroneous only if it is "against the clear weight of the evidence, or if [we] otherwise reach[] a definite and firm conviction that a mistake has been made."[20]

**ANALYSIS**

¶38 On appeal, the State first argues that the post-conviction court erred in concluding that a determination of factual innocence can be based on a combination of newly discovered evidence and previously available evidence, so long as the newly discovered evidence provides some of the basis for the determination. Next, the State argues that the post-conviction court erred in determining that Ms. Brown established her factual innocence by clear and convincing evidence. Ms. Brown cross-appeals and argues that the post-conviction court erred in granting summary judgment on her claims under Part 1 of the PCRA. She also argues that, even if her claims under Part 1 of the PCRA are time-barred, the statute of limitations in the PCRA is unconstitutional.

¶39 We affirm the post-conviction court. We first interpret Part 4 of the PCRA and hold that a post-conviction determination of factual innocence can be based on both newly discovered evidence and previously available evidence. Next, because the State did not properly challenge the post-conviction court's factual findings, we affirm the post-conviction court's ultimate determination that Ms. Brown is factually innocent. We therefore do not reach Ms. Brown's cross-appeal.

I. THE PLAIN LANGUAGE OF THE PCRA ALLOWS A DETERMINATION OF FACTUAL INNOCENCE TO BE BASED ON BOTH PREVIOUSLY AVAILABLE EVIDENCE AND NEWLY DISCOVERED EVIDENCE

¶40 Part 4 of the PCRA[21] contemplates a two-stage process for

---

[19] *State v. Levin*, 2006 UT 50, ¶ 20, 144 P.3d 1096 (alterations in original) (internal quotation marks omitted).

[20] *State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

[21] Ms. Brown filed her petition for factual innocence in 2009, but the parties and the post-conviction court have all relied on the 2010 version of the PCRA up to this point in the proceedings. The 2010 amendments did not materially alter the language at issue in this

(continued...)

establishing factual innocence. Section 78B-9-402 sets forth what a petitioner must do at the first stage to receive an evidentiary hearing on her petition for factual innocence.[22] If the petitioner meets her threshold burden under section 402, a post-conviction court turns to the second stage of the process, which is outlined in section 78B-9-404. That provision sets forth how the evidentiary hearing is to proceed and gives direction to courts on how to determine factual innocence.[23] The parties' arguments on appeal center on what role newly discovered evidence must play in this process.

¶41 In its Memorandum Decision, the post-conviction court recognized that the plain language of section 404 does not require a finding of factual innocence to be based on newly discovered evidence. The court determined, however, that given the emphasis on newly discovered evidence at the pleading stage of a factual innocence claim under section 402, "[i]t would be peculiar if a similar evidentiary basis did not apply during the hearing stage." It thus concluded that "it may base its determination of factual innocence either upon newly discovered evidence alone or a combination of evidence—as long as the newly discovered material evidence provides at least part of that basis."

¶42 The State maintains that the post-conviction court erred when it determined that newly discovered evidence need only provide a part of the basis for a determination of factual innocence. The State argues that, "[w]hen properly read, the PCRA's factual innocence part requires that newly discovered evidence establish

---

[21] (...continued)
case. So to maintain consistency, we also rely on the 2010 version unless otherwise noted.

[22] *See* UTAH CODE § 78B-9-402 (stating that "[a] person . . . may petition the district court . . . for a hearing to establish that the person is factually innocent" and setting forth the threshold requirements). We stress that the sufficiency of Ms. Brown's petition is not at issue on this appeal. We consider section 402 only to place section 404 in proper context. But given that Ms. Brown did not include the evidence provided by Mr. Carlsen and Mr. Hall in her petition for factual innocence, there is a question whether her petition should have been granted in this case. As the post-conviction court noted, however, the State never challenged whether Ms. Brown's evidentiary hearing should go forward.

[23] *See generally id.* § 78B-9-404.

factual innocence, not merely play some part in the determination." The State thus contends that the newly discovered evidence must be "the pivotal transformative evidence" in the court's factual innocence determination.

¶43 As an initial matter, the State does not dispute that Mr. Carlsen's testimony is "newly discovered evidence," as that term is defined in the PCRA.[24] Due to issues of credibility, however, the court determined that Mr. Carlsen's testimony was entitled only "to *some* weight" and that his testimony did not "independently establish by clear and convincing evidence that Lael was alive at a time when the State argued he must have been dead." The court found, however, that Mr. Carlsen's testimony, as newly discovered evidence, "constitutes some evidence in support" of its factual innocence finding. The issue for us, therefore, is to determine whether newly discovered evidence must be the "pivotal" or "transformative" evidence in support of factual innocence or whether it need only provide some basis for the court's ultimate decision.

¶44 This issue presents a question of statutory interpretation. "Our primary objective in interpreting a statute is to give effect to the intent of the legislature."[25] In so doing, "we look first to its plain language and presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning."[26] Although "statutory text may not be plain when read in isolation, [it] may become so in light of its linguistic, structural, and

---

[24] *See id.* § 78B-9-401.5(3) ("'Newly discovered material evidence' means evidence that was not available to the petitioner at trial or during the resolution on the merits by the trial court of any motion to withdraw a guilty plea or motion for new trial and which is relevant to the determination of the issue of factual innocence . . . ."). Ms. Brown disputes the post-conviction court's determination that Mr. Hall's testimony is not newly discovered evidence. Because the State agrees, however, that Mr. Carlsen's testimony is newly discovered, and because we affirm the post-conviction court's conclusion that a determination of factual innocence can be based on a combination of old and new evidence, we do not reach this argument.

[25] *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 13, 280 P.3d 410.

[26] *Boyle v. Christensen*, 2011 UT 20, ¶ 27, 251 P.3d 810 (internal quotation marks omitted).

statutory context."[27] Thus, "our interpretation of a statute requires that each part or section be construed in connection with every other part or section so as to produce a *harmonious whole*."[28] Finally, "[i]f the language of the statute yields a plain meaning that does not lead to an absurd result, the analysis ends."[29]

¶45   We conclude that the plain language of the PCRA allows a court to base its determination of factual innocence on all available evidence—both old and new. Beginning with stage one, section 402, entitled "Petition for determination of factual innocence—Sufficient allegations—Notification of victim," sets forth threshold requirements a petitioner must meet to receive an evidentiary hearing.[30] Section 402 states that "[t]he petition shall contain an assertion of factual innocence under oath by the petitioner, and shall aver, with supporting affidavits or other credible documents, that . . . newly discovered material evidence exists that, if credible, establishes that the petitioner is factually innocent."[31]

¶46 Section 402 directs the court to view the petitioner's averment of newly discovered evidence "*with all the other evidence*" to determine whether the petitioner has met the threshold requirements for a hearing.[32] Based on the plain language of section 402, it is clear that, in order to be entitled to an evidentiary hearing, a petitioner must allege that newly discovered evidence exists that establishes factual innocence. And the court, in order to grant the petition for an evidentiary hearing, must determine that the newly discovered evidence, when viewed with all the other evidence, demonstrates factual innocence. Accordingly, section 402 requires a

---

[27] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (internal quotation marks omitted).

[28] *Anderson v. Bell*, 2010 UT 47, ¶ 9, 234 P.3d 1147 (internal quotation marks omitted).

[29] *Carranza v. United States*, 2011 UT 80, ¶ 8, 267 P.3d 912.

[30] *See* UTAH CODE § 78B-9-402(1) ("A person . . . may petition the district court . . . for a hearing to establish that the person is factually innocent . . . .").

[31] *Id.* § 78B-9-402(2)(a). The newly discovered material evidence must also "establish[] innocence" and be more than "impeachment evidence" or "cumulative of evidence that was known." *Id.* § 78B-9-402(2)(a)(ii)–(iv).

[32] *Id.* § 78B-9-402(2)(a)(v), -402(2)(b) (emphasis added).

threshold showing of newly discovered evidence that a petitioner must meet in order to receive an evidentiary hearing.

¶47 We note that at the petition stage, the court is in no position to assess credibility. Section 402 requires the petitioner to assert factual innocence under oath and to include "supporting affidavits or other credible documents," but beyond this requirement, the petitioner need only allege newly discovered evidence that—"if credible"—"establishes that the petitioner is factually innocent."[33] Thus, section 402 limits the court to the content of the petition and requires it to assume the new evidence is credible.

¶48 We also note that, even at the petition stage, the plain language of section 402 undercuts the State's argument that newly discovered evidence must be "the pivotal, transformative evidence" in the court's determination of factual innocence. Section 402 explicitly directs the court to view the new evidence "with all the other evidence."[34] Nowhere does it state that the newly discovered evidence alone must be determinative. Therefore, even section 402 contemplates that it will require a combination of new and old evidence to establish factual innocence.

¶49 Once a petitioner makes the threshold showing of newly discovered evidence and the court grants the petition for an evidentiary hearing, the petitioner moves to the second stage of the process, which is set forth in section 78B-9-404. Section 404 is entitled "Hearing upon petition—Procedures—Court determination of factual innocence." It places the burden on the petitioner to "establish the petitioner's factual innocence by clear and convincing evidence."[35] In determining whether the petitioner has met the burden of establishing factual innocence, "the court *shall consider*, in addition to the evidence presented at the hearing under this part, the record of the original criminal case and at any postconviction proceedings in the case."[36]

¶50 Section 404 clearly contemplates that the court will consider the full universe of evidence available in the case. It even provides that "[t]he court may consider: (a) evidence that was suppressed or

---

[33] *Id.* § 78B-9-402(2)(a)(i).

[34] *Id.* § 78B-9-402(2)(a)(v).

[35] *Id.* § 78B-9-404(1)(b).

[36] *Id.* § 78B-9-404(3) (emphasis added).

would be suppressed at a criminal trial; and (b) hearsay evidence."[37] Importantly, section 404 never uses the phrase "newly discovered evidence." Nor does it provide any direction on how much weight to place on any one type of evidence. Again, nowhere does it state that newly discovered evidence alone must be determinative. Instead, the plain language of section 404 provides only one clear directive: a court shall base its determination of factual innocence on a consideration of "all the evidence"—old and new.[38]

¶51 The State argues, however, that section 404 merely establishes what evidence is admissible at the factual innocence hearing. It does not, the State contends, override the requirement in section 402 that newly discovered evidence must establish factual innocence. But section 404's plain language indicates that the legislature intended the section to provide direction to courts on how to determine a claim of factual innocence, not just to set forth what evidence is admissible. For example, it is only by looking to section 404 that we discover the evidentiary standard and a party's burden for establishing a claim of factual innocence.[39] Moreover, the title of section 404 is "Court determination of factual innocence."[40] Therefore, section 404 governs a court's ultimate determination of factual innocence, not section 402.

¶52 Common sense supports our conclusions that section 404 controls a court's ultimate determination of factual innocence and that a court may base its determination on all the available evidence. Indeed, it would be strange to direct a court to consider "all the evidence" but then limit its decision to only the pivotal new evidence, especially without giving the court any guidance on how to determine whether a given piece of evidence is, in fact, pivotal. There is no reason to direct a court to "consider" evidence if that evidence cannot play a significant role in the court's ultimate decision.[41] Furthermore, it is not workable to require courts to

---

[37] *Id.* § 78B-9-404(2).

[38] *Id.* § 78B-9-404(4).

[39] *See id.* § 78B-9-404(1)(b), (4) (providing that "[t]he burden is upon the petitioner to establish the petitioner's factual innocence" and directing the court to determine factual innocence by "clear and convincing evidence").

[40] *Id.* § 78B-9-404.

[41] *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 279 (1988)

(continued...)

identify particular evidence as pivotal. A court could be faced with two pieces of evidence: one developed at the original trial and a second at the factual innocence hearing. Either one alone could be meaningless, but both taken together could be significant. We therefore decline the State's invitation to require courts to base their decisions exclusively on newly discovered pivotal or transformative evidence.

¶53 Finally, the State contends that "[i]f a factual innocence determination could be based on previously presented evidence, a post-conviction court could improperly substitute its judgment for the jury's." As discussed above, however, the State concedes that Mr. Carlsen's testimony is newly discovered evidence. Thus, we are not faced with the issue of whether a court could base its decision of factual innocence solely on previously available evidence. We recognize only that, under the plain language of the PCRA, previously available evidence can play a significant role in the court's ultimate decision of factual innocence. Because this plain reading of the statute is in no way unreasonable, our analysis ends.[42] But we are also confident that the high threshold showing of new evidence in section 402, when strictly applied,[43] will ensure that newly discovered evidence plays a role in a court's determination of factual innocence under section 404.

¶54 We therefore hold that, under the plain language of the PCRA, the post-conviction court did not err in concluding that a determination of factual innocence can be based on a combination of newly discovered evidence and previously available evidence.

## II. BECAUSE THE STATE FAILED TO PROPERLY CHALLENGE THE POST-CONVICTION COURT'S FACTUAL FINDINGS, WE AFFIRM THE COURT'S DETERMINATION OF FACTUAL INNOCENCE

¶55 After the March 7 hearing, the post-conviction court made two critical factual findings in reaching its ultimate determination of factual innocence. First, the court found "by clear and convincing

---

[41] (...continued)
(defining "consider" as "to think about carefully," especially "with regard to taking some action").

[42] *Carranza*, 2011 UT 80, ¶ 8; *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135.

[43] *See supra* ¶ 40 n.22.

evidence that Lael Brown was alive Saturday afternoon on November 6, 1993." Second, the court found "by clear and convincing evidence that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, have been firmly established." Based on these two findings, the court "determine[d] by clear and convincing evidence that [Ms. Brown] did not engage in the conduct for which she was convicted and is, therefore, factually innocent of the aggravated murder of Lael Brown."

¶56 The State contends that the post-conviction court misapplied the standard for factual innocence. The State argues that "a reasonable juror could hear all of [Ms. Brown's] evidence, including [Mr.] Hall's testimony, and still find [Ms. Brown] guilty." This, the State claims, is because "the post-conviction court's conclusion . . . is not *the only* reasonable conclusion to be drawn from the evidence. A juror could reasonably weigh the evidence differently." Specifically, the State argues that (1) evidence exists that contradicts Hall's testimony; (2) while Brown's motive to murder Lael was disputed at trial, she now admits to forging Lael's checks; and (3) it is possible that Ms. Brown murdered Lael at a time other than Saturday morning. Therefore, the State maintains that Ms. Brown failed to demonstrate by clear and convincing evidence that she did not engage in the conduct for which she was charged.

¶57 The State also argues that our deferential clear error standard of review does not apply to the post-conviction court's ultimate determination of factual innocence. In so arguing, it concedes that it "is not challenging any of the post-conviction court's factual findings." The State instead contends that the ultimate determination of factual innocence is a mixed question of fact and law and that, once we apply this standard, the post-conviction court's determination deserves little, if any, deference.

¶58 We conclude that, while the ultimate determination of factual innocence may be a mixed question of fact and law, this point is inconsequential in light of the State's explicit acknowledgment that the post-conviction court's factual findings are accurate. Because the State declined to challenge the court's factual findings as clearly erroneous, we accept the findings as true and therefore must conclude that Ms. Brown has established her factual innocence. We therefore affirm the post-conviction court.

¶59 We have stated that "[s]tandards of review should allocate discretion between the trial and appellate courts in a way that takes account of the relative capabilities of each level of the court

19

system."[44] "[A]n appellate court reviews a trial court's conclusions of law for correctness because a single trial judge is in an inferior position to determine what the legal content of [a legal concept] should be."[45] Conversely, "[b]ecause a trial court is in a better position to judg[e] credibility and resolv[e] evidentiary conflicts, an appellate court reviews the trial court's findings of fact for clear error."[46]

¶60   In this case, the post-conviction court made two findings that were purely factual: (1) Lael was alive Saturday afternoon on November 6, and (2) Ms. Brown firmly established her whereabouts between Saturday afternoon and the remaining time the murder could have occurred.[47] Furthermore, the court reached these findings only after judging credibility and resolving evidentiary conflicts. For example, the court weighed Mr. Carlsen's credibility, found that Mr. Hall testified truthfully, and specifically considered "the manner in which [Ms. Brown] testified and her demeanor on the witness stand." The court also discounted the testimony of Lael's son, Mike, due to admitted memory problems and placed less weight on hearsay evidence offered by the State. And the court considered and discounted the State's evidence suggesting a time of death earlier than 9:00 p.m. on Saturday, November 6. Because the court's findings are purely factual and based on credibility judgments and resolutions of evidentiary conflicts, we apply the deferential clear error standard on appeal.

¶61   Yet the State declines to undertake a clear error analysis on this appeal "*because [it] is not challenging any of the post-conviction court's factual findings.*" [State's Reply Brief, 16 (emphasis added).] Thus, the State has explicitly acknowledged that it does not challenge *any* of the post-conviction court's factual findings. Chief among these are that (1) Lael was alive as of Saturday afternoon; and

---

[44] *State v. Levin*, 2006 UT 50, ¶ 19, 144 P.3d 1096 (internal quotation marks omitted).

[45] *Id.* ¶ 20 (second alteration in original) (internal quotation marks omitted).

[46] *Id.* (second and third alterations in original) (internal quotation marks omitted).

[47] *See State v. Pena*, 869 P.2d 932, 935 (Utah 1994) ("Factual questions are generally regarded as entailing the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind.").

(2) Ms. Brown firmly established her whereabouts during the period in which Mr. Brown must have been murdered. While the State admits these two central facts, it nevertheless argues that the application of these facts to the legal standard for establishing factual innocence constitutes a mixed question of fact and law.

¶62 Given this concession, the State's position on this issue is confusing. On the one hand, the State clearly concedes the post-conviction court's factual findings that Lael was alive Saturday afternoon and that Ms. Brown firmly established her whereabouts for the remaining time period during which the murder could have occurred. But on the other hand, the State attacks the underlying evidence on which the court relied in making these factual findings by exhaustively listing other credible evidence that would allow a juror to still find Ms. Brown guilty.[48]

¶63 In offering these two inconsistent positions, the State appears to mistake *findings of fact* with *evidence*. We readily recognize the existence of evidence in this case that calls into question the post-conviction court's factual findings. And we agree with the State that the court's ultimate decision of factual innocence "is not *the only*

---

[48] For example, the State points out that (1) "[n]one of the waitresses who worked at Angie's on that Saturday recalled seeing Lael that day"; (2) "[t]he man that [Mr.] Hall allegedly saw with Lael has never come forward to confirm that he was with Lael on that Saturday afternoon"; (3) "Lael did not answer numerous phone calls from his granddaughter and ex-wife on Saturday, even though his ex-wife routinely called on Saturday mornings"; (4) "Lael's truck was in his driveway from at least 10:00 a.m. to 4:30 p.m."; (5) "Lael's neighbor . . . was outside during that time and never saw Lael come or go or follow his usual practice of puttering around his yard"; (6) "Lael never returned on Saturday to complete the plumbing repairs, despite his promise to do so"; (7) Lael never picked up Ms. Brown's soup, so he would have had to step over it twice on his way to and from Angie's Restaurant if Mr. Hall's testimony was accurate; (8) it is still undisputed that Ms. Brown had access to Lael's house; (9) Ms. Brown now admits to forging Lael's checks; (10) Ms. Brown's son's testimony at trial that he saw Lael write a check to his mother is now false; (11) there is evidence that Lael discovered Ms. Brown's forgeries before his death; (12) the missing bank records from Lael's house still implicate only Ms. Brown; and (13) Ms. Brown still could have committed the murder later in the day on Saturday, November 6. [State's Brief, 48-54.]

reasonable conclusion to be drawn from the evidence." [State's Brief, 49.] But in light of the State's concession that the court's *factual findings* are accurate, the mere existence of contradictory, underlying *evidence* is of no consequence. It is precisely because the court had to judge credibility and resolve conflicting evidence that we now grant deference to its factual findings. In our court system, district courts are better positioned to make these findings.[49] We therefore decline, as an appellate court, to scrutinize the post-conviction court's factual findings where the State has explicitly acknowledged their accuracy.

¶64   Given our conclusion relating to the State's concession, there is no merit to the State's claim that the post-conviction court misapplied the standard for factual innocence. It is true that the post-conviction court ultimately applied a legal concept. This concept required Ms. Brown to show by clear and convincing evidence that she did not "engage in the conduct for which [she] was convicted."[50] But it is nevertheless true that the post-conviction court found that Lael must have been murdered at a time when Ms. Brown had an established alibi. Once these facts are accepted, as they must be in light of the State's concession, they lead inevitably to the conclusion that Ms. Brown did not murder Lael and is factually innocent.

¶65   The dissent criticizes our reliance on the State's concession, however, as overly broad and unfair.[51] It argues that in the context of the overall briefing, the State meant to concede only "pure" facts, not "hybrid" facts—a distinction the dissent admits is invalid.[52] The dissent contends that the two critical findings discussed above regarding the time of Lael's death and Ms. Brown's whereabouts were challenged by the State on appeal as "hybrid" facts and thus do not fall within the State's concession.[53] The dissent would therefore review the post-conviction court's factual findings under a clear

---

[49] *Levin*, 2006 UT 50, ¶ 20.

[50] UTAH CODE § 78B-9-401.5(2)(a) (defining factual innocence); *see also Greener v. Greener*, 212 P.2d 194, 204 (Utah 1949) (stating that clear and convincing evidence "carries with it, not only the power to persuade the mind as to the probable truth or correctness of the fact it purports to prove, but has the element of clinching such truth or correctness").

[51] *Infra* ¶¶ 77–78.

[52] *Infra* ¶¶ 94–95, 99.

[53] *Infra* ¶ 95.

error standard and reverse.[54] While the dissent presents an analysis that is thoughtful and worthy of careful consideration, we respectfully disagree with it for a number of reasons.

¶66   First, the way in which the State has briefed its case is wholly consistent with its explicit concession that it is not challenging the post-conviction court's factual findings. It makes no attempt to meet its burden on appeal to demonstrate that the factual findings—whether "pure" or "hybrid"—are clearly erroneous.[55] The State instead openly insists that a clear error analysis is unnecessary, which can only be true, of course, if the facts are not at issue. Moreover, the State does not even purport to marshal the evidence.[56] It merely, though exhaustively, lists the evidence it claims contradicts the evidence relied on by the post-conviction court in making its finding of factual innocence.[57] But it makes no effort to assume the role of devil's advocate and marshal the evidence in support of the court's factual findings,[58] which, again, is consistent with its assertion that it is not challenging the court's factual findings.

¶67   This is not a case where a party is simply unaware of its burden on appeal. Indeed, the State repeatedly cites the correct standard, including the duty to marshal the evidence, to us in its briefing. [State's Brief, 2; State's Reply Brief, 13–14.] Whether or not the State's failure to argue clear error was grounded on a distinction

---

[54] *Infra* ¶ 119.

[55] *See In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989) (discussing a party's burden when challenging a factual finding).

[56] We stress that we do not "fault the State for a failure to marshal" the evidence. *Infra* ¶ 101. We merely note that its failure to do so is consistent with its position that it is not challenging the post-conviction court's factual findings on appeal.

[57] *Supra* ¶ 62 & n.49.

[58] *See United Park City Mines Co. v. Stichting Mayflower Mountain Fonds*, 2006 UT 35, ¶ 26, 140 P.3d 1200. The dissent recommends that we "abandon this principle" of requiring parties to assume the role of devil's advocate when marshaling the evidence. *Infra* ¶ 106. But regardless of any merit that argument may have going forward, for purposes of this case, our marshaling standard unquestionably governs any challenge by the State of factual findings on appeal, and the State is, of course, well aware of that requirement. [State's Reply Brief, 14.]

between "hybrid" and "pure" facts, it remains the case that the State, based on its concession, failed to carry its burden on appeal.[59] Thus, we conclude that the overall context of the State's briefing supports our decision in this case.[60]

---

[59] *See In re Estate of Bartell*, 776 P.2d at 886 (stating that the court must "rely heavily on the presumption of correctness that attends [factual] findings" when a party fails to carry its burden to demonstrate clear error). The dissent acknowledges that the State has failed to present a clear error analysis. *See infra* ¶ 111 ("The State should . . . have framed [its] argument in terms of the applicable standard of appellate review. It should have asserted that there was 'clear error' in not concluding that Ms. Brown had failed to remove all 'serious or substantial doubt' as to her factual innocence."). It nevertheless deems this a "rhetorical deficiency" and concludes that the State "effectively challenges" the post-conviction court's factual findings "on that basis." *Infra* ¶¶ 100, 108. The dissent thus characterizes the State's approach in a way the State itself has expressly rejected.

The State's claim that the clear error standard does not apply on appeal was in direct response to Ms. Brown's application of the clear error standard in her brief. [*See* Brown's Brief, 42; State's Reply Brief, 15.] Ms. Brown analyzed each of the post-conviction court's factual findings, including the two key findings regarding Lael's time of death and Ms. Brown's whereabouts, using a clear error analysis. [Brown's Brief, 42–48.] In so doing, Ms. Brown explicitly pointed out that the State had employed the wrong standard of review—a "reasonable juror" standard—for challenging factual findings in its opening brief. [Brown's Brief, 47.] One would expect, therefore, that if the State is indeed challenging the facts, as the dissent maintains it is, it would have disputed Ms. Brown's contention that it applied the wrong standard of review. But instead, the State concedes in its reply brief that it is not challenging the facts. [State's Reply Brief, 16.] Thus, in attempting to excuse the State's "rhetorical deficiency," the dissent ignores the explanation the State itself gives for its approach: it means only to argue that the court erred in its application of the factual innocence standard, even accepting the court's factual findings. [State's Brief, 47–49]; *see also supra* ¶ 56.

[60] We therefore disagree with the dissent that we are misconstruing a "single" sentence in the State's overall briefing. *See infra* ¶¶ 72, 79. As the dissent recognizes, the concession appears in a section of the State's reply brief in which it contests Ms. Brown's application of

(continued...)

(...continued)
the clear error standard of review. *Infra* ¶ 89. The full paragraph in which the State conceded the post-conviction court's factual findings reads as follows:

> **Applicable standard of review.** [Ms. Brown] first argues that the applicable standard of review is clear error. But that standard applies only when a court reviews purely factual questions. The clear error standard does not apply in this case, because the State is not challenging any of the post-conviction court's factual findings. Rather, the State challenges only the court's legal conclusions based on its factual findings.

[State's Reply Brief, 15–16.] It is difficult to see how the State could have stated more clearly that it is not challenging the underlying factual findings in this case. And, as discussed above, the State briefed its argument consistent with this concession by not engaging in a clear error analysis.

We also disagree that the State's arguments in its reply brief or elsewhere diminish or clarify the scope of its concession. *Infra* ¶¶ 91–92. We openly recognize that the State presents us with evidence that contradicts the post-conviction court's factual findings. *See supra* ¶¶ 62–63 & n.49. But we believe the dissent misapprehends the State's apparent tactic in doing so. The State is not—as it concedes—seeking to overturn the court's factual findings under a clear error analysis. It instead attempts to show that, in light of the contradictory evidence, the court erred in concluding that the factual innocence standard had been met, even accepting the unchallenged factual findings. [State's Brief, 47–49.] This is because, according to the State, "a reasonable juror" could disagree with the court, [State's Brief, 48], or the court's decision "is not *the only* reasonable conclusion" given the evidence, [State's Brief, 49].

The "confusion" we expressed on this point earlier in this opinion, *supra* ¶ 62, does not relate to the scope of the State's concession, as the dissent seems to suggest, *see infra* ¶ 88. Rather, we were simply expressing confusion as to why the State would undertake such a strategy. *See supra* ¶¶ 63–64. At this juncture in the process, it is not our role to determine what a reasonable juror would conclude as to the facts or whether there are other reasonable factual conclusions in light of the evidence. Our role is limited: we decide only whether the court committed clear error in making the

(continued...)

¶68 Second, we disagree with the dissent's construction of the State's concession as running only to so-called "pure" facts.[61] Any confusion as to the scope of the concession was cleared up by the State itself when it stated, immediately after its concession, that it "*challenges only the court's legal conclusions based on its factual findings*." [State's Reply Brief, 16 (emphasis added).] This statement clearly concedes all factual findings, whether "pure" or "hybrid," by placing only the post-conviction court's "legal conclusions" at issue on appeal. Surely the State did not mistakenly assume the court's key factual findings as to the time of Lael's death and Ms. Brown's whereabouts to be legal conclusions.[62]

¶69 Although the State has declined to challenge the post-conviction court's factual findings for clear error, the dissent has done so in an able and vigorous way.[63] While we do not reach this issue given our reliance on the State's concession, we nevertheless express disagreement with how the dissent has approached its analysis. The dissent proposes that, by "pure" factual findings, the State simply meant findings as to witness credibility at the post-conviction hearings; and that, by "hybrid" findings, the State meant those findings implicating evidence from the first trial.[64] Both Mr. Hall and Ms. Brown testified for the first time at the post-conviction hearings,[65] and the court made specific credibility findings as to each.[66] Thus, these findings would presumably qualify as unchallenged "pure" facts under the dissent's approach. The dissent seems to disregard, however, the post-conviction court's

---

(...continued)
factual findings that it made. *Levin*, 2006 UT 50, ¶ 20; *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 580–81 (1985).

[61] *Infra* ¶ 98.

[62] *But see infra* ¶ 90 (arguing that "[i]n context, it is impossible to read [the State's concession] fairly to encompass the 'key' determinations of the timing of Mr. Brown's death and the whereabouts of Ms. Brown").

[63] *Infra* ¶ 119–28. *But see In re Estate of Bartell*, 776 P.2d at 886 (recognizing that "the burden of overturning factual findings is a heavy one, reflective of the fact that *we do not sit to retry cases submitted on disputed facts*" (emphasis added)).

[64] *Infra* ¶¶ 89–90.

[65] *Supra* ¶¶ 21, 34.

[66] *Supra* ¶¶ 27, 34.

credibility findings in its clear error analysis. Instead, the dissent repeatedly dismisses Ms. Brown's account of her whereabouts as "subjective" and "self-serving" without acknowledging the unchallenged finding that Ms. Brown testified credibly.[67] So even if we were to accept the dissent's hypothesis that the State's concession runs only to so-called "pure" facts, we would still have to address the difficult question of how the post-conviction court's determination is clearly erroneous when it is conceded to be based on credible evidence.[68]

---

[67] *Infra* ¶¶ 126, 127. We do not mean to suggest that the court's credibility findings could not be found to be clearly erroneous if properly challenged. But the State, as the dissent recognizes, concedes their accuracy. Their accuracy is therefore not at issue in this case.

[68] *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶¶ 72–73, 99 P.3d 801 (stating that district court's factual finding was not clearly erroneous, even in light of "plausible evidence" to the contrary, where it was based on credible evidence); *see also Anderson*, 470 U.S. at 575 (noting that factual findings "based on determinations regarding the credibility of witnesses" are afforded "even greater deference . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").

The dissent also argues that the post-conviction court clearly erred, even accepting its credibility findings, because Ms. Brown's "account of her whereabouts . . . does not at all rule herself out as Lael Brown's murderer." *Infra* ¶ 115. This is because "even according to Ms. Brown's own evidence, she was at the scene of the crime at a time when the murder may have been committed." *Infra* ¶ 114.

Even were we to reach this issue, which we do not, we think there is a serious question as to whether the court clearly erred in this regard. The evidence is not at all clear that Ms. Brown's account of her whereabouts placed her at the scene of the crime at a time the murder was committed. She certainly does admit, however, to taking soup to Lael's house on Saturday, November 6. According to the court's account of the record, she delivered the soup sometime between 2:00 p.m. and 3:00 p.m. Mr. Hall originally stated that he saw Lael alive at 2:30 p.m. but then testified at the factual innocence hearing that it was closer to 1:00 p.m. Thus, depending on how we view the evidence, there is at least a very narrow window, 2:30 p.m.

(continued...)

¶70   Regardless of whether Ms. Brown's alibi is the "weakest [the dissent has] heard of,"[69] the mere fact that an alibi is self-serving (they always are) or that it is offered by a boyfriend or a son does

---

(...continued)
to 3:00 p.m., and at most an hour window, 2:00 p.m. to 3:00 p.m., during which Ms. Brown placed herself at Lael's house at a time when Lael might possibly have been there. We therefore agree with the dissent that there is potentially some room to doubt the court's finding that Ms. Brown firmly established her whereabouts, even accepting the court's credibility findings.

But the clear and convincing evidence standard, by its very nature, tolerates *some* doubt. We have stated that "a burden of proof is an expression of society's tolerance for error in a particular realm of the law." *Essential Botanical Farms, LC v. Kay*, 2011 UT 71, ¶ 21, 270 P.3d 430. Clear and convincing evidence is an "intermediate standard of proof" that "implies something more than the usual requirement of a preponderance . . . of the evidence; and something less than proof beyond a reasonable doubt." *Id.* ¶¶ 21, 24 (internal quotation marks omitted). We have characterized this standard as requiring the "existence of facts that make a conclusion very highly probable." *Id.* ¶ 24 (internal quotation marks omitted).

Under this standard, and given the unchallenged credibility findings, it is not a foregone conclusion that the court clearly erred in determining that Ms. Brown established her whereabouts. The State has never presented any evidence that the murder occurred during the relevant hour of 2:00 p.m. to 3:00 p.m. Further, the court specifically recognized that Ms. Brown "may have been alone during a portion of the afternoon on Saturday" but discounted this fact because "evidence was presented suggesting that Lael was not killed during this time frame." Specifically, Lael's neighbor, Kimberly Standridge, testified at trial that she did not hear any gunshots Saturday afternoon and that, if there were any, she would have heard them because she was working in her yard during the relevant time. The court also relied on Dr. Grey's time of death estimate based on the physical evidence, which "strongly suggest[ed] that Lael was likely killed around 9:00 p.m.," not Saturday afternoon. In our view, given this contrary evidence, the question is still open as to whether the court clearly erred in discounting the doubt identified by the dissent.

[69] *Infra* ¶ 75.

not make it somehow inherently incredible as a matter of law. The post-conviction court's decision in this case was based on a weighing of evidence and is laced with credibility findings.[70] We are not deciding this case in the first instance and should not presume that we are more capable of analyzing credibility.[71] Our role as an appellate court is to assess whether there has been clear error as to the post-conviction court's factual findings.[72] We have been presented with no such argument and therefore affirm.

## CONCLUSION

¶71  We affirm the post-conviction court. We hold that a post-conviction determination of factual innocence can be based on both newly discovered evidence and previously available evidence. Also, because the State did not properly challenge the post-conviction court's factual findings, we affirm the post-conviction court's ultimate determination that Ms. Brown is factually innocent.

———————

JUSTICE LEE, dissenting:

¶72 The legal questions in this case seem to me to yield straightforward answers requiring reversal. I see no reasonable way to read the briefing on appeal as the majority does—to suggest that the State waived its entire appeal by a single sentence in its reply brief. And if we consider the legal merits of the case, we must reverse, as the district court clearly erred in finding Debra Brown factually innocent by clear and convincing evidence.

¶73 I can appreciate a sense of concern for the plight of Ms. Brown. She served seventeen years for a murder that she may not have committed. She has since been released from prison for almost two years on a district judge's determination that she was factually innocent. And her case on appeal presents the gut-wrenching question whether to uphold her release or reinstate a conviction that could result in her return to prison.

———————

[70] *Supra* ¶ 60.

[71] *See, e.g., Anderson*, 470 U.S. at 574 ("The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.").

[72] *Levin*, 2006 UT 50, ¶ 20; *see also Anderson*, 470 U.S. at 580–81 (recognizing the limited role of appellate courts when reviewing factual findings under a clear error standard).

¶74  I acknowledge some degree of doubt as to Debra Brown's guilt, and some hesitation regarding the prudence of a decision that could result in her return to prison. But the law yields no relevance to my human sympathy for Ms. Brown or my personal doubts about her guilt, much less for any free-ranging evaluation on my part of the prudence of her incarceration status.[73] We are tasked under the law to consider a much narrower question—whether the district court erred in finding her "factually innocent" under the governing statute. And that question, for me, has a straightforward answer.

¶75  I find clear error in the district court's determination that Ms. Brown established her factual innocence by "clear and convincing" proof of an alibi. As far as alibis go, this is the weakest I have heard of. Ms. Brown's whereabouts are established only by her own self-interested testimony and by that of her son and boyfriend. And even accepting Ms. Brown's evidence and disregarding the State's contrary proof, Ms. Brown has not established an alibi in the sense of an indication that she could not have been at the scene of the crime at the time it was committed;

---

[73] It bears emphasizing that the decision before us is not whether to return Ms. Brown to prison; it is only whether to reverse a decision vacating her conviction. And upon such reversal, another body of government would still retain the discretionary authority to override any effect of reinstating Ms. Brown's conviction—to pardon Ms. Brown or commute her sentence to time served. Under our law, the Board of Pardons would retain that discretion. *See* UTAH CODE § 77-27-5(1)(a) ("The Board of Pardons and Parole shall determine by majority decision when and under what conditions, subject to this chapter and other laws of the state, persons committed to serve sentences in . . . all felony cases except treason or impeachment . . . may be released upon parole, pardoned, ordered to pay restitution, or have their fines, forfeitures, or restitution remitted, or their sentences commuted or terminated.").

If the court were to follow the law as I see it and reinstate Ms. Brown's conviction, there is no guarantee she would be returned to prison. It is also possible that she would be pardoned or that her sentence would be commuted. Whatever the likelihood of that eventuality, we must not confuse our authority with that of the Board of Pardons. That entity is charged by law to consider "when and under what conditions" individuals convicted of felonies "may be released upon parole, pardoned . . . or [have] their sentences commuted or terminated," *id.*; this court must simply follow the law.

quite the contrary, Ms. Brown's own evidence places her *at the scene of the crime* (Lael Brown's house) *at the time she claims it was committed* (Saturday afternoon). This is the opposite of an alibi. Ms. Brown did not establish her innocence based on the fact that she was "in a location other than the scene of the crime at the relevant time," BLACK'S LAW DICTIONARY 84 (9th ed. 2009) (defining "alibi"); she demonstrated the opposite—that she *was* present at the scene of the crime at the time of the murder.

¶76 Granted, Ms. Brown denied that she committed the murder and insisted that she was visiting Mr. Brown to deliver him chicken soup. But that is not an alibi; nor is it the kind of demonstration (much less a "clear and convincing" one) required by statute—that Ms. Brown "did not engage in the conduct" for which she was convicted. Instead of an alibi, Ms. Brown's case was an attempt at a do-over on the trial in which she was convicted. That is not the basis for a factual innocence determination under our law. We cannot affirm that decision without distorting the law of factual innocence.

¶77 The majority seems to acknowledge as much in "recogniz[ing] the existence of evidence . . . that calls into question the post-conviction court's factual findings," *supra* ¶ 63, and in resolving the case instead on the basis of a supposed concession in the State's brief. I dissent on that point too. I see no reasonable way to read the State's briefs to concede away the whole case through an isolated statement in its reply brief. In context, the State's indication that it was not challenging post-conviction court's "factual" findings is a narrow concession. If we read that concession fairly in context, it would not encompass the two critical determinations identified by the court—that (a) Lael Brown was alive Saturday afternoon on November 6, 1993, and (b) Ms. Brown's whereabouts from Saturday afternoon on November 6 to the early morning hours of Sunday, November 7 were firmly established. In fact, the State contested both points at length throughout its briefs, and clarified at oral argument that it was not conceding them (a point acknowledged even by counsel for Ms. Brown). In any event, at a minimum it is clear that the State at least challenged the probity of Ms. Brown's alibi (even assuming a concession as to her whereabouts and the time of Lael Brown's death).

¶78 A fair reading of the briefing thus seems to me to keep the key issues properly in play, and accordingly to require us to address the merits of the case. I would reach the merits, and I would reverse.

JUSTICE LEE, dissenting

I

¶79  Unlike the majority, I do not read the State's demurrer of any challenge to the "post-conviction court's factual findings" as an effective waiver of its entire case. First, it seems to me that the referenced "factual findings" do not encompass the questions of whether Lael Brown was alive on Saturday afternoon or whether Debra Brown established her whereabouts through Sunday morning. Rather, in light of the context of the overall briefing in this case, of the paragraph in which the concession appears in the reply brief, and of the parties' statements at oral argument, it strikes me as clear that the State was *not* conceding these determinations (which the State consistently, if a bit oddly, referred to as "hybrid" findings and not "pure factual" findings)—and indeed was contesting them hotly. Thus, in this context, I would read the State's briefing as conceding only what it denominated "pure" findings of fact—those not implicating any reweighing of evidence presented at the original trial.

¶80 Second, even assuming acceptance of the time of Lael Brown's death and of Debra Brown's accounts of her own whereabouts, there is no doubt that the State has not conceded the key question in the case on the merits—which is whether Ms. Brown carried her burden of proving her factual innocence by clear and convincing evidence. At a bare minimum, the State has clearly challenged the viability of Ms. Brown's alibi. Thus, even accepting that Mr. Brown was alive on Saturday afternoon and that Ms. Brown accounted for her whereabouts until Sunday morning, the State has contended that Ms. Brown still has no clear and convincing alibi—because, after all, she placed herself at the scene of the crime at a time when the murder may have happened.

A

¶81  Any suggestion that the State was not contesting the timing of Lael Brown's death or Debra Brown's account of her whereabouts is impossible to square with the overall substance of the State's briefing, with the specific context of the State's concession in its reply brief, and with both parties' statements at oral argument on appeal. The contrary grounds articulated by the majority, moreover, are unpersuasive.

1

¶82  The State's challenges to the determination that Lael Brown was alive on Saturday afternoon were extensive. In its opening brief, the State argued that even though Hall's testimony indicated he had

seen Lael Brown alive on Saturday afternoon, there was substantial evidence to the contrary, such that a "juror could reasonably conclude that Hall was mistaken about seeing Lael Brown on that afternoon of Saturday, 6 November 1993." [State's Brief, 48–49.]

¶83  The State enumerated extensive grounds supporting this conclusion. Those grounds included the following: (1) "[n]one of the waitresses who worked at Angie's on that Saturday recalled seeing Lael that day" even though "Lael was not just a regular customer" and "visited Angie's like clockwork"; (2) "Lael did not answer numerous phone calls from his granddaughter and Clara on Saturday, even though Clara routinely called on Saturday mornings"; (3) "Lael's truck was in his driveway from at least 10 a.m. to 4:30 p.m."; (4) "Lael never returned on Saturday to complete the plumbing repairs [he had started the night before], despite his promise to do so"; (5) "[t]he man that Hall allegedly saw with Lael has never come forward to confirm that he was with Lael on that Saturday afternoon"; (6) "Lael's neighbor . . . was outside during that time and never saw Lael come or go or follow his usual practice of puttering around his yard"; and (7) "Lael never picked up the soup that [Ms. Brown] said she left on his porch around 2 p.m." even though he would have had to "step over the soup at least once—when returning from Angie's."[State's Brief, 48–49; *see also* 30–31, 35–36.] The State's brief noted that the "post-conviction court dismissed the above evidence in a footnote by positing that 'other plausible explanations, including that Lael was simply not feeling well, could also easily account for these facts,'" but explained that such a "theory . . . does not explain why he nevertheless felt well enough to go to Angie's in the earlier afternoon." Thus, the State argued, even if the "post-conviction court's conclusion [was] a reasonable [one], it [was] not *the only* reasonable conclusion to be drawn from the evidence." [State's Brief, 49.]

¶84  The State's challenges to Ms. Brown's whereabouts were also extensive. In several places in its opening brief, the State identified numerous grounds challenging Ms. Brown's evidence, [State's Brief, 30–31, 35–36, 53–54] such as its argument that "two independent witnesses contradicted [Ms. Brown's] account that she was at her son's basketball game from 10:45 a.m. to 12:15 p.m." [State's Brief, 53.] The State's opening brief summarized: "The evidence thus still supports a reasonable conclusion that [Ms. Brown] had the opportunity to murder Lael, notwithstanding [Delwin] Hall's . . . testimony." [State's Brief, 52–54.]

¶85 Elsewhere, the State notes that even if Hall's testimony is accepted at face value, "it still does not demonstrate [Ms. Brown's] factual innocence" because "[g]iven the substantial evidence that incriminated [her] a reasonable juror could still find that she murdered Lael sometime after Hall allegedly saw him." [State's Brief, 52.] Thus, the State explained, "[a] reasonable juror could . . . disagree with the post-conviction court's conclusion 'that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th have been firmly established.'" [State's Brief, 52–54.]

¶86 In light of the foregoing, the State went on to summarize additional evidence that might cause a juror to doubt the post-conviction court's conclusion. The State noted, for example, that it was Ms. Brown's boyfriend and son who "corroborated parts of [her] account of her whereabouts," and that because both had close relationships to Ms. Brown "both had a motive to lie for her." [State's Brief, 53.] Moreover, the State indicated that it is significant that "Buttars [Ms. Brown's son]—who perjured himself at trial—provided the only corroboration of her claim that she arrived home shortly after midnight on Sunday morning," [State's Reply Brief, 1], because "[a]ccording to the medical examiner, [Ms. Brown] could have killed Lael anytime before 3 a.m. Sunday morning," such that "even if she did not murder Lael early Saturday morning, a reasonable juror could still find that she murdered him late Saturday night or early Sunday morning." [State's Brief, 52–54.]

¶87 The above leaves no question that the State was challenging—and not conceding—the two "critical" factual determinations identified by the court, *supra* ¶ 55, and of course the ultimate determination of Ms. Brown's factual innocence. Yet instead of crediting the substance of the State's arguments, the majority deems them waived by a single sentence in the State's reply brief—the one indicating that the State was not challenging the district court's "factual" determinations. The court's inference is more than a stretch. In the face of extensive factual arguments in the State's briefing, we should be loath to conclude that the State abandoned the essence of its case in one sentence of its reply brief.

2

¶88 The majority acknowledges an "inconsisten[cy]" between the State's "concession" that it contests no factual issues and its arguments "attack[ing] the underlying evidence on which the court relied in making these factual findings." *Supra* ¶¶ 62–63. Any apparent inconsistency, however, disappears upon consideration of

the broader context of the briefing on appeal. That context reveals that the State was not at all conceding the "key" determinations discussed by the majority (which the State denominated as "hybrid" determinations), but was instead just waiving any objection to the district court's evaluation of issues such as witness credibility (which the State referred to as "pure" factual findings).

¶89 The concession in question appears in a section of the reply brief in which the State is addressing the applicable standard of review. In acknowledging that "clear error" is the standard that applies to factual determinations, the State sought to distinguish "pure" and "hybrid" questions of fact, insisting that the "clear error" standard "applies *only* when a court reviews *purely factual* questions." [State's Reply Brief, 15–16 (emphasis added).] Because the State's briefing does not challenge any factual findings denominated by the State as "pure" (such as credibility of witnesses at the factual innocence hearing), it was thus able to insist that the clear error standard was inapplicable. And that was the precise context of the concession given such a broad reading by the majority. In the sentence immediately following the distinction between "pure" and "hybrid" questions of fact, the State indicates that "[t]he clear error standard does not apply in this case *because the State is not challenging any of the post-conviction court's factual findings*." [State's Reply Brief, 16.]

¶90 In context, it is impossible to read this sentence fairly to encompass the "key" determinations of the timing of Mr. Brown's death and the whereabouts of Ms. Brown. The distinction that preceded it had just clarified that the State's case on appeal was all about so-called "hybrid" questions (those implicating reweighing of evidence presented at the initial trial, such as the timing of Mr. Brown's death and the whereabouts of Ms. Brown) and not at all about "pure" questions (those not implicating reweighing of evidence presented at trial).

¶91 The headings and content of the reply brief confirm this reading. While the concession appears in a section captioned "Applicable standard of review," [State's Reply Brief, 15–18], the brief includes a separate section challenging the "key" determinations supposedly conceded by the State in a section captioned "Evidence at the reopened hearing." [State's Reply Brief, 18–22.] And the content of this subsection makes clear that the State's earlier "concession" does not cover these two determinations.

¶92 In discussing the conclusion that Lael was alive on Saturday afternoon, the State's reply brief notes that the "post-conviction

court's determination" on that score "hinged entirely on Del Hall's testimony," while asserting that "Hall's testimony did not clearly and convincingly establish [Ms. Brown's] factual innocence, because substantial evidence, detailed in the State's Opening Brief, contradicted Hall's assertion that he saw Lael at Angie's on Saturday afternoon," such that "a reasonable juror could have easily found that Hall was mistaken about seeing Lael at Angie's." [State's Reply Brief, 19.] Similarly, in addressing the argument that Ms. Brown's whereabouts had been adequately established, the State notes that "the only evidence of her whereabouts came from herself, her boyfriend—Brent Skabelund, and her son—Ryan Buttars. Both Skabelund and Buttars had a motive to lie for [her]. Indeed Buttars perjured himself for [Ms. Brown] by falsely testifying at trial that he saw Lael write a $1000 check to [her] that [she] now admits she forged." [State's Reply Brief, 20.]

¶93 Thus, the context of the "concession" forecloses the broad reading that the majority gives it. The State was not at all rescinding the essence of its case; it was simply positing a difference between the issues it was pressing ("hybrid") and those it was not ("pure" questions of fact).

3

¶94 Any doubt on this score was completely resolved at oral argument in this court. There, in response to the court's questions about the scope of the State's concession, counsel explained that the State meant only to waive any challenge to the district court's "pure" factual determinations—which it viewed as encompassing only those determinations made by the trial court based solely on evidence it heard directly. Oral Argument, September 4, 2012, at 5:46–6:44, 13:28–13:51. As the State explained, such findings would include a determination that a particular witness (e.g., Del Hall) was credible. Oral Argument, September 4, 2012 at 7:59–8:17.

¶95 The State proceeded to clarify that it was, of course, challenging "hybrid" factual determinations, which in its view depended on re-weighing of evidence presented in the prior trial. Oral Argument, September 4, 2012, at 6:20–6:42, 6:57–7:06; 14:25–14:30, 15:49–16:15. In this case, hybrid findings were expressly explained to include the district court's determinations that (1) Lael Brown was alive Saturday afternoon and (2) Ms. Brown had firmly established her whereabouts for all periods during which the murder might have occurred. Oral Argument, September 4, 2012, at 5:46–6:42, 7:31–7:58, 13:28–13:52, 14:25–14:33.

¶96 Upon direct questioning, the State's counsel emphasized that the State *was* challenging these findings. When asked whether the State was "challenging those [two] subsidiary determinations by the district court," counsel replied that "[w]e are saying they are incorrect and are not pure factual findings." Oral Argument, September 4, 2012 at 7:07–7:40; *see also id.* at 13:28–13:51 (reaffirming that the State was challenging these findings).

¶97 Counsel for Ms. Brown indicated the same understanding. When asked specifically whether the State was conceding the "determination with respect to whether Lael Brown was alive during the afternoon," Ms. Brown's counsel candidly indicated that "they are not conceding that point at all. I think they are challenging that factual determination by the district court." Oral Argument, September 4, 2012, at 21:56–23:10. Similarly, when asked whether he believed the State had conceded the determination that Ms. Brown had adequately accounted for her whereabouts, her counsel said "they don't concede that." Oral Argument, September 4, 2012, at 21:56–23:10.

¶98 Thus, the context of the State's briefing made its reply brief concession clear to both sides. Everyone understood that in context, the State intended only to waive objection to what it characterized as "pure" findings of fact. Everyone understood that the matters argued at length in the State's brief—regarding the timing of Mr. Brown's death and the whereabouts of Ms. Brown up until then—were matters pressed on appeal to this court.

¶99 This holds regardless of the viability of the State's distinction between "hybrid" and "pure" factual findings. I agree with the majority's rejection of that distinction. Empirical questions are questions of fact, *see Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 40, __ P.3d __, and all such questions are subject to review for clear error. I see no room in our law, in other words, for any distinction between "hybrid" and "pure" questions of fact.[74]

---

[74] That is not to say that the distinction is without logical foundation. One of the rationales for granting deference to factual determinations—that the court has a "comparative advantage in its firsthand access to factual evidence," *see Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 40, __ P.3d__ —is not implicated in a case where the court is making its findings, in part, based on a cold record from a prior proceeding. Oral Argument, September 4,

(continued...)

But the question before us is not whether to accept the State's proposed distinction. It is how to construe the concession in its reply brief — the sentence indicating that it was not "challenging any of the post-conviction court's factual findings." And in light of the State's proposed distinction — as set forth in the briefs, and as understood by both sides at oral argument — there is no question as to what the State meant when it waived any challenge to the lower court's findings of fact. It used that term in a narrow, limited sense — a sense that avoids the "inconsistency" acknowledged by the court and that avoids the puzzling inference of an intent by the State to stipulate away the entirety of its case on appeal.

4

¶100   Notwithstanding the above, the majority still deems the State to have forfeited any effective challenge to the district court's factual innocence determination. It roots that conclusion in part in "the way in which the State has briefed its case" on appeal — specifically, in its purported failure to "marshal the evidence" supporting the district court's findings and in not pressing its challenge to the district court's decision in terms of a "clear error analysis." *Supra* ¶ 66. I read the State's briefing differently. I think the State has effectively marshaled the contrary evidence in the record. And although the State has not employed the terminology of "clear error," it seems to me that the substance of its argument effectively challenges the district court's decision on that basis. In any event, in my view any rhetorical deficiency in the briefing is understandable and ought to be overlooked in light of the complex, first-impression nature of the issues presented for our review.

(a)

¶101   We should not fault the State for a failure to marshal because Ms. Brown never asked us to do so, and the State

---

(...continued)
2012, at 15:49–16:15. But in my view the State's proposed distinction still fails under our relevant case law, which suggests an additional rationale for reviewing factual determinations deferentially — that "there is no particular benefit in establishing settled appellate precedent" on case-specific factual questions. *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 40. This second rationale is equally applicable to both "pure" and "hybrid" factual determinations, and thus forecloses the State's proposed distinction.

accordingly has had no opportunity to explain itself. Absent such explanation, we are in no position to assess the degree to which the State has carried any burden to marshal. Indeed, a *sua sponte* marshaling dismissal would turn the rationale for the marshaling rule on its head, as an independent assessment of a party's compliance with the rule would require exactly what the rule is designed to prevent—an investment of the court's time in digging through the record. *See Chen v. Stewart*, 2004 UT 82, ¶ 79, 100 P.3d 1177 (citing judicial economy considerations in support of the marshaling rule).

¶102 Having done just that, I would conclude that the State's briefs are sufficient. They appear to me to effectively comply with our marshaling rule by presenting substantial discussion and meaningful analysis of the evidence supporting each of the findings at issue on appeal.

(I)

¶103 In disputing that Lael was alive on Saturday afternoon, *see supra* ¶¶ 82–83, the State's opening brief extensively discusses the evidence supporting the trial court's determination that he was. This includes discussion and explanation of the following evidence: (1) the "medical examiner testified that the physical findings 'were most consistent or most typical of a time of death around 9 p.m. on Saturday" and that "Lael likely died around 9:15 p.m. on Saturday, 6 November 1993, and no later than 3 a.m. on Sunday, 7 November"; [State's Brief, 20.] (2) Standridge, Lael Brown's neighbor, was painting outside her home "between 10 a.m. and 4:30 p.m. that Saturday" and "did not hear any gunshots" even though she "could hear Lael's phone ringing"; [State's Brief, 7.] (3) another neighbor, Paulette Nyman, now believed "she heard the shots on the same day that she saw police activity at Lael's home, which would have been Sunday"; [State's Brief, 21.] (4) the police had received tips from two people—Delwin Hall and an unnamed secretary at Cache Valley insurance—who said they saw Lael on Saturday afternoon, and the police may have disregarded these tips; [State's Brief, 19, 25.] (5) an officer had testified at the evidentiary hearing that he "vaguely recalled one of Lael's neighbors telling him that she heard shots on Saturday night"; [State's Brief, 21.] (6) "[a] few days after the murder, Hall told police . . . he had seen Lael having coffee at Angie's on Saturday" and gave a written statement to a police officer stating that he was a "friend/coffee drinking buddy of Lael's" and that he saw Lael "Saturday, 11-6-93 at approx. 1430 hours in Angie[']s," a time he was "sure of . . . because he was

stopping at Angie's before going to work at Albertsons at 1500 hours"; [State's Brief, 25–27.] (7) Ms. Brown's counsel "called Delwin Hall to testify about his tip to police" at the PCRA hearing and he continued to maintain — at the PCRA hearing — that "at the time [he] was quite sure that it was on a Saturday that [he] saw him";[75] [State's Brief, 25–27.] (8) Delwin Hall did not know and had never spoken to Ms. Brown; [State's Brief, 25–27.] (9) Terry Carlsen, who knew Lael and said he was Lael's "good friend[]" testified he was "certain" "that on Saturday he saw Lael and Mike Brown [Lael's son] at Angie's around 7:15 p.m.," where they stayed for a "half hour and left around 7:45 p.m." and that "Carlsen said he learned of Lael's death on Sunday and was surprised to think that he had just seen Lael the night before"; [State's Brief, 27.] (10) even though Mike Brown, Lael's son, testified he was not with his father at any time on Saturday, "he had memory problems during 1993-1994 from alcoholism"; [State's Brief, 27–28.] (11) one waitress, Holly Crockett, who had worked from 3 to 11 p.m. on Saturday, November 6 testified that "she thought she saw Lael on Saturday night"; (12) none of the statements given by Angie's waitresses — indicating that they had not seen Lael on Saturday — were inconsistent with Hall's testimony; [State's Brief, 31–32.] and (13) Lael Brown may have not

---

[75] The State notes that "[t]he court's ruling hinged on Hall's testimony" and that "the significance of the evidence provided by Hall cannot be overstated" because it provided "direct evidence that Lael was alive Saturday afternoon" in contrast to the "circumstantial evidence at trial that Lael was killed Saturday morning."[State's Brief, 30.] The State also asserts:

> The court found that Hall was credible and "not mistaken when he stated that he saw Lael at Angie's Restaurant during the early afternoon hours on Saturday, November 6th." The court noted that Hall gave his statement to Detective Ridler less than four days after Hall saw Lael at Angie's and "there were no intervening weekends to cause confusion." The court also found it significant that Hall told Detective Ridler he saw Lael on "Friday *night* as well as Saturday *afternoon*." The court noted that Hall had "a high degree of certainty" about his testimony and no evidence suggested that Hall was easily confused about dates or had short-term memory problems.

[State's Brief, 30.]

been feeling well on Saturday, leading him to "not have kept his morning coffee ritual, answered his ex-wife's and granddaughter's telephone calls, worked in his yard, driven his truck, kept his promised appointment to complete the plumbing repairs, or picked up [Ms. Brown's] soup from the porch." [State's Brief, 32.]

(ii)

¶104 Similarly, in arguing that Ms. Brown could not adequately account for her whereabouts during all times when the murder might have occurred, *supra* ¶¶ 84–86, the State presented substantial discussion and explanation of evidence that supported the trial court's determination that she could. This included the following evidence: (1) Ms. Brown had explained her whereabouts for all time periods during which the murder might have occurred;[76] [State's

---

[76] Moreover, the State's brief actually provides [Ms. Brown's] account of her whereabouts during all relevant times. This substantial discussion notes:

> At the evidentiary hearing, [Ms. Brown] testified that on Saturday morning, she left Skabelund's home around 6 or 7 a.m., went home, bathed, and then went to the store to buy ingredients to make soup for Lael and her daughter, who was also sick. She testified that her son Ryan Buttars saw her sometime that morning. Ryan testified at trial that he could not remember when he awoke Saturday morning, but 'it was kind of late' and his mother was there when he awoke. Consistent with the trial evidence, [Ms. Brown] said that Clara Brown called her around 9:55 a.m. on Saturday morning after she could not reach Lael by phone. They talked for about twenty-seven minutes. Clara asked [Ms. Brown] to check on Lael and call her back if he was sick. Skabelund arrived at [Ms. Brown's] home while she was talking to Clara. [Ms. Brown] testified that she and Skabelund left around 10:40 or 10:45 a.m. to attend her son's basketball game. [She] and Skabelund testified that they stayed for the whole game. [She] did not say when the game ended, but Skabelund testified at trial that they left the game at 12:15 p.m. . . . [Ms. Brown] said that after the game, she and Skabelund had lunch at a drive-in and Skabelund took her home where she slept for a while.

(continued...)

Brief, 21–23.] (2) Standridge, Lael's neighbor, was painting outside her home "between 10 a.m. and 4:30 p.m. that Saturday" but never heard any gunshots, even though she heard Lael's phone ringing several times during that period; [State's Brief, 7.] (3) Paulette Nyman, another neighbor, who had originally told police that she heard shots on Saturday, said she may have actually heard the shots on Sunday morning; [State's Brief, 5.] (4) Ms. Brown had taken and passed a polygraph in which she was asked whether she had killed Lael; [State's Brief, 20.] (5) Ms. Brown "presented police tip sheets in which people near Lael's home reported hearing gunshots at times other than around 7 a.m. on Saturday, November 6th"; [State's Brief, 21.] (6) in a direct appeal from her conviction, this court stated that Ms. Brown "could account for her whereabouts for the entire weekend except for early Saturday morning; [State's Brief, 32–33.] (7) the trial court believed that "no evidence was presented to suggest that [Ms. Brown's] account of [her] whereabouts [was] inaccurate" and although she may have been alone at times "no evidence [was] ever . . . presented establishing that Lael was killed during the time period she was by herself"; [State's Brief, 33.] and (8) Ms. Brown had testified she returned to Lael's house on Sunday,

---

(...continued)

> She said she delivered the soup to Lael, and possibly her daughter, between 2 and 3 p.m. [Ms. Brown] claimed that although Lael's truck was there, he did not answer when she knocked. [She] said she wrote Lael a note which she left with the soup on his porch. She said she did not use her key to take the soup in because she thought that Lael might be sleeping. She also said she wanted to avoid talking with Lael because he could talk for a long time. She did not check on Lael, even though she had told Clara that she would. Rather, [Ms. Brown] returned home. Around 4:30 p.m., [Ms. Brown] and Skabelund went grocery shopping, then had dinner at [Ms. Brown's], and later watched a movie at Skabelund's. [Ms. Brown] testified that she left Skabelund around 10 or 11 p.m. and went back to her house where she slept. She believed that her sons were still awake when she arrived home. At trial, Skabelund testified that [Ms. Brown] left his home around midnight Saturday night. Her son Ryan testified at trial that she returned home 'after midnight' on Sunday, November 7.

found the chicken soup on the porch in the "identical" spot and, upon discovering that Lael was cold, "ran from the house yelling for help" before "return[ing] to the house and call[ing] 911."[State's Brief, 9.]

(b)

¶105 The majority's objection to the above is its conclusion that it is merely a "list" of "evidence relied on by the post-conviction court" that does not "assume the role of devil's advocate." *Supra* ¶ 66. Because the latter role is one the court deems essential, it finds the State's briefing "consistent" with the inference that it is "not challenging the court's factual findings." *Supra* ¶ 66.

¶106 Both the premise and the ensuing inference strike me as problematic. As for the premise (that marshaling requires devil's advocacy), I see nothing in our rule that requires a lawyer to abandon his usual role of zealous advocacy. *See* UTAH R. PROF'L CONDUCT 1.3, cmt. [1]. And I confess that I have no idea what the notion of devil's advocacy entails in practice. We have sometimes said that it requires counsel to "temporarily remove [their] own prejudices and fully embrace the adversary's position," *Chen,* 2004 UT 82, ¶ 78 (internal quotation marks omitted), but I see no way to apply that standard in a predictable, judicially-manageable way. Given that it finds no basis in our rule, and in light of the significant consequences at stake (dismissal without reaching the merits), I would abandon this principle. It is a trap for the unwary, and a tool for arbitrary judicial decision making.[77]

---

[77] In an appropriate case, we should revisit and clarify our doctrine of marshaling. Our case law in this field is marked by vagaries and contradictions. We sometimes treat failures to marshal as decisive of an appeal, *see, e.g., United Park City Mines Co. v. Stichting Mayflower Mountain Fonds,* 2006 UT 35, ¶¶ 38, 41, 140 P.3d 1200, and other times overlook such failures and proceed to the merits, *see, e.g., State v. Green,* 2005 UT 9, ¶¶ 12–13, 108 P.3d 710. Conspicuously missing from our cases is any principled explanation for this all-important distinction. Instead of announcing any such basis, we have expressly *declined* to impose any limits on our ability to invoke marshaling as a basis for default on appeal, citing our purportedly limitless discretion. *See Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-Day Saints,* 2007 UT 42, ¶¶ 19–20, 164 P.3d 384 (noting that parties risk forfeiting their challenges to factual questions when they fail to marshal but sustaining the court of appeals' choice to resolve

(continued...)

¶107 I would likewise reject the inference the majority draws from the State's briefing. Under the circumstances, I see no basis for treating the State's failure to play "devil's advocate" as an indication of an intent to waive the crux of its case on appeal. Instead, I would attribute it to the State's attempt to distinguish "pure" and "hybrid" facts. Under rule 24(a)(9) of the Utah Rules of Appellate Procedure, marshaling of "record evidence that supports [a] challenged finding" is required only where a party is challenging a "fact finding."[78] And because the State believed that there was a legally-significant distinction between "pure" and "hybrid" factual determinations, it seems to have read this marshaling requirement as applying only to "pure" findings of fact made by the judge in the first instance, not "hybrid" determinations based in part on review of a cold paper record from a prior case.[79] That would explain why it expressly announced that it was "recit[ing] all the evidence produced *at the factual innocence* hearing that *both supports and*

---

(...continued)
the case on its merits because "[t]he reviewing court . . . retains discretion to consider independently the whole record and determine if the decision below has adequate factual support").

Under our cases as they now stand, a wary litigant would be left to discern only one real principle in our marshaling cases: We impose the sanction of default when we want to and reach the merits when we don't. Such unbridled discretion is incompatible with the judicial function. We cannot be said to be deciding cases under the rule of law where our gate keeping for appellate decision making is so haphazardly marked.

[78] *See , e.g., Gilbert v. Utah Down Syndrome Found., Inc.* (*In re Discipline of Gilbert*), 2012 UT 81, ¶ 14 n.3, 301 P.3d 979 ("[B]ecause the Foundation does not challenge any of the district court's factual findings, it had no marshaling obligation."); *Rapela v. Green*, 2012 UT 57, ¶ 12 n.2, 289 P.3d 428 (explaining that marshaling requirement only applies where "fact[ual] finding[s]" are challenged (internal quotation marks omitted)).

[79] *See In re Discipline of Sonnereich*, 2004 UT 3, ¶ 45 n.14, 86 P.3d 712 (concluding that failing to marshal was not "dispositive" of an appeal because "the district court's bad faith finding was based primarily on memoranda submitted by the parties").

*undercuts* [Ms. Brown's] claims."[80] [State's Brief, 13 n.7 (emphasis added).]

(c)

¶108   Nor do I see a basis for any inference to be drawn from the State's failure to phrase its challenge to the district court's findings in terms of "clear error." *Supra* ¶ 67 n.61. The State's rhetorical tack followed naturally from the proposed pure/hybrid distinction. It deemed only the former subject to review for clear error, and thus framed its challenges to what it viewed as "hybrid" determinations in other terms. Again, I disagree with this distinction. But the point is that it explains — and in my view excuses — any rhetorical flaw in the State's briefing.[81]

---

[80] Moreover, to the extent this statement is an assertion that the marshaling obligation extended only to evidence adduced at the PCRA hearing and not the original trial, this belief may also stem in part from the State's contention that newly-discovered evidence must be the pivotal, transformative evidence in demonstrating factual innocence. After all, this type of evidence would necessarily come to light at the hearing, not at the prior trial.

[81] The majority ignores this distinction in asserting that I have "characterize[d] the State's approach in a way the State itself has expressly rejected." *Supra* ¶ 67 n.60. Once this distinction is understood, it becomes clear that the State's purported "concession" in its reply brief does not encompass these findings — and thus that my position is not in tension with the State's briefing.

The majority's contention that the State was responding to Ms. Brown's invocation of the clear error standard — and that she subsequently applied this standard in analyzing the time of Lael Brown's death and Ms. Brown's whereabouts, *supra* ¶ 67 n.60 — does not undermine this conclusion. The section of the State's brief captioned "Reply to Petitioner's Point 2," in which the purported "concession" appears, makes four, distinct points. The first is that "clear error is [not] the appropriate standard of review." [State's Reply Brief, 15.] In making this point, the State expressly references page 42 of Ms. Brown's brief. This page of the brief, however, never speaks about Lael's time of death or Ms. Brown's whereabouts on the day of the crime. These issues are discussed later in the brief, [Brown's Brief, 43–48.] and, importantly, the State addresses these portions of Ms. Brown's brief in three subsequent sections of its reply brief. [State's Reply Brief, 18–22.] Thus, the statement in the State's

(continued...)

¶109 As the majority indicates, the State's challenges to the district court's findings are sometimes phrased in terms asserting that the court's decision was "not the only reasonable conclusion" that could be drawn from the evidence. *Supra* ¶ 67 n.61 (internal quotation marks and emphasis omitted). But I would not read that formulation as a waiver of a challenge to the district court's findings—or even as incompatible with the applicable standard of review. This is hardly the first time an appellant has filed a brief in our court exhibiting confusion or even outright error as to the applicable standard of review. Our typical response is the one we should invoke here—to articulate the correct standard of review, and then to proceed to assess the appellant's position under that standard.

¶110 In this case, moreover, the State's confusion is understandable in light of the inherent tension—and interplay—between the strict standard of proof applicable at the district court level (requiring proof of factual innocence by "clear and convincing evidence") and the lenient standard of review that governs on appeal (calling for deference to the district court's determination absent a showing of "clear error").[82] Proof by clear

---

(...continued)

brief "that the clear error standard does not apply" was not a "direct response to Ms. Brown's application of the clear error standard in her brief" to the "two key findings regarding Lael's time of death and Ms. Brown's whereabouts." *Supra* ¶ 67 n.60. Rather, it was a direct response to Debra Brown's choice to invoke this standard at all in the case.

[82] Other courts have observed this interplay and explained that "in applying [a] standard of review, we necessarily incorporate an understanding of the appropriate burden of proof in the district court." *See Mondaca-Vega v. Holder*, 2013 WL 1760795, at *8–11 (9th Cir. April 25, 2013) (explaining this point in applying a "clear error" standard of review to a district court's factual finding where the burden of proof was by "clear and convincing" evidence and ultimately concluding that "the district court's key finding, that Petitioner is Salvador Mondaca-Vega, is not clearly erroneous under the 'clear and convincing' standard of proof"); *Marsellus v. C.I.R.*, 544 F.2d 883, 885 (5th Cir. 1977) ("The issue of fraud is a factual one. Thus, we may reverse the Tax Court's finding of fraud only if we find that it was 'clearly erroneous.' At the same time, we must judge the Tax Court's findings in light of the government's burden of proving

(continued...)

and convincing evidence is hard to come by. "[F]or a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains *no serious or substantial doubt* as to the correctness of the conclusion." *Sine v. Harper*, 222 P.2d 571, 581–82 (Utah 1950) (emphasis added) (internal quotation marks omitted). So it is understandable that the State's briefing would seek to invoke and apply this high standard of proof—which *does* appropriately temper the otherwise high, clear error standard of review—by repeatedly asserting that the district court's determinations were "not the only reasonable conclusion[s]" that could be drawn from the evidence, *supra* ¶ 67 n.61 (internal quotation marks and emphasis omitted).[83] And in light of the interrelationship between the standard of review and burden of proof, it seems clear to me that these assertions should be viewed as advancing the State's argument that there is "serious or substantial doubt as to the correctness" of the district court's conclusions, and thus that reversal is in order in light of Ms. Brown's failure to carry her burden of proving factual innocence by clear and convincing evidence.[84]

---

(...continued)
section 6653(a) fraud by 'clear and convincing' evidence." (citations omitted)); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 622, 627 (Tex. 2004) ("As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance. . . . In sum, we think that whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated." (internal quotation marks omitted)).

[83] The State made this point repeatedly in the argument section of its briefing. [State's Brief, 35–36, 49–50, 52.]

[84] This point is made clear in the State's "summary of the argument," where it explains: "[T]he court erred in concluding that Petitioner's evidence at the reopened hearing established her factual innocence. . . . Substantial evidence contradicted . . . Petitioner's account of her whereabouts. Therefore, a reasonable juror hearing all of the evidence could still find Petitioner guilty. Because Petitioner's evidence did not even present a reasonable juror from still finding her guilty, that evidence necessarily failed to clearly and convincingly demonstrate Petitioner's factual innocence." [State's Brief, 35–36.]

¶111   The State should also have framed this argument in terms of the applicable standard of appellate review. It should have asserted that there was "clear error" in not concluding that Ms. Brown had failed to remove all "serious or substantial doubt" as to her factual innocence.[85] But the absence of that verbiage seems quite inconsequential—certainly not enough to justify avoiding the merits in a case of this consequence, particularly in a case implicating complex questions of first impression.

(d)

¶112   These matters of first impression are manifold. They include whether the factual innocence determination must rest exclusively on entirely new evidence; whether so-called "hybrid" questions are subject to a less deferential standard of review; and how the "clear and convincing" standard of proof affects the appellate standard of review.

¶113   In light of these questions, I would at least acknowledge room for doubt about the propriety of the methodology of the State's case on appeal. And I would give the parties the benefit of any doubt on the matter—in a manner preserving our ability to reach the merits. On a first-impression question of this complexity, we should tread lightly. We should not foreclose a review of the merits on the basis of our disagreement with the terms or methodology of the parties' briefing. I would accordingly conclude that the State effectively challenged the district court's determinations regarding the timing of Lael Brown's death and regarding Ms. Brown's account of her whereabouts.

B

¶114   Even assuming, however, that the State had accepted these determinations, there is still another sense in which the State's position on the merits is properly before us on appeal. At a minimum, the State has challenged the viability of Ms. Brown's alibi.

---

[85] The State *did* invoke this standard in the "statement of the issues" section of its brief. There, it asserted that the second issue on appeal was whether "the post-conviction court erroneously concluded that Petitioner had demonstrated her factual innocence by clear and convincing evidence." The State asserted it had "preserved this issue . . . by arguing that Petitioner did not meet her burden," and explaining that "[a] post-conviction court's legal conclusions are reviewed for correctness and its factual findings for clear error." [State's Brief, 2.]

It has done so by noting that even according to Ms. Brown's own evidence, she was at the scene of the crime at a time when the murder may have been committed. In particular, the State argued that Ms. Brown's evidence did not "affirmatively show" what her evidence was required to show—"that she did not kill Lael Brown at any time"—because her evidence "still support[ed] a reasonable conclusion that [she] had the opportunity to murder Lael." [State's Brief, 52–53.] And as explained in greater detail in the merits discussion below, that is enough to preserve the crucial issue before us on appeal—and, in fact, to require reversal on the merits.

¶115   That conclusion is not at all undermined by the district court's "credibility findings." *Supra* ¶ 69. The credibility of Debra Brown's account of her whereabouts can be accepted without undermining the State's case on appeal. Because Ms. Brown placed *herself* at the scene of the crime, it matters not that her credibility "would presumably qualify as [an] unchallenged 'pure' fact[]."[86]

---

[86] It is, however, unclear that the State would agree with this characterization. In the first place, the State erroneously believed that it did not *need* to challenge Debra Brown's credibility since it believed Debra Brown's post-conviction testimony could not be relied upon in assessing her factual innocence since this testimony was not "newly discovered evidence because it [was] always available to [her] at trial." [State's Brief, 43.] The State's briefing led with and expended significant ink on this newly-discovered evidence point. Its counsel also expended significant effort pressing the point at oral argument.

Moreover, the State's briefing also attacked Debra Brown's credibility repeatedly. It argued that "[a] reasonable juror could . . . disagree with the post-conviction court's conclusion that Petitioner's whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday November 7th, have been firmly established" because "the evidence of Petitioner's whereabouts depends on her credibility, and a reasonable juror would have good reason to doubt her credibility where she admitted to having stolen from Lael and lied about it." [State's Brief, 52.] The State also argued that the district court was incorrect in concluding that "'no evidence was presented to suggest that [Petitioner's] account of [her] whereabouts is inaccurate" because "[t]he evidence at trial . . . did not merely 'suggest' that Petitioner's account of her whereabouts was inaccurate; it *demonstrated* that her account was inaccurate," such that "a reasonable juror could still find Petitioner guilty because serious credibility concerns surround Petitioner's account of her

(continued...)

*Supra* ¶ 69. Her account of her whereabouts can be accepted as credible—and perfectly accurate—as its timing does not at all rule herself out as Lael Brown's murderer.[87]

¶116   There is of course one aspect of Debra Brown's testimony that must be understood to be in question in order for us to reach the merits of the case on appeal, and that is her ultimate denial of the charge of killing Lael Brown. But surely even the majority does not read the State's briefs to concede her credibility on that point (since acceptance of her denial would defeat any basis for an appeal). In fact, the State's briefing makes this point directly. Despite recognizing that Debra Brown "testified that she did not murder Lael Brown and that she did not know who did," [State's Brief, 24.] the State nonetheless asserts that "[t]he Legislature could not have intended that a petitioner could establish her factual innocence merely by testifying that she is innocent." [State's Brief, 43.][88] So at

---

(...continued)
whereabouts." [State's Brief, 53 (emphasis in original).]

[87] This point is underscored by the district court's initial determination—after hearing Debra Brown's testimony—that she had failed to prove her factual innocence by clear and convincing evidence. The State's brief highlighted this point as well: "As explained, the court relied on the correct legal standard when it discounted all of Petitioner's evidence at the four-day evidentiary hearing. In the court's view, that evidence did not even meet the lower 'no reasonable juror could have convicted' standard that Petitioner advocated. Rather, the court concluded that 'reasonable jurors still could have differed on what the old and new facts established and whether the prosecution could have proven its case beyond a reasonable doubt.' Because Petitioner's evidence could not even satisfy the PCRA's lesser standard, the court correctly reasoned that the evidence necessarily could not satisfy the factual innocence statute's higher standard." [State's Brief, 47.]

[88] The State's briefing also argues that "[g]iven the substantial evidence that incriminated Petitioner, a reasonable juror could still find that she murdered Lael sometime after Hall [a witness who claimed he had seen Lael in the early afternoon on Saturday] allegedly saw him." [State's Brief, 52.] Similarly, it explained that "[s]ubstantial evidence contradicted . . . Petitioner's accounts of her whereabouts," such that "a reasonable juror hearing all of the evidence could still find Petitioner guilty." [State's Brief, 35–36.] And

(continued...)

least to that extent, even the majority must understand the State to be challenging Debra Brown's credibility. And on that question, we cannot possibly conclude that she carried her burden of establishing her factual innocence by clear and convincing evidence.

¶117 In asserting her factual innocence, Ms. Brown has insisted that although she was at the scene of the crime at a time when the murder could have been committed, she simply didn't do it. If that is clear and convincing proof of factual innocence, our courts will be inundated with (presumptively meritorious) factual innocence petitions. So, on the narrow point of "credibility" that *is* obviously in question, the district court's credibility determination should be reversed as clearly erroneous.[89]

---

(...continued)
in discussing Petitioner's account of her whereabouts—and the alibi in particular—the State used terms such as "said" and "claimed," arguing that "she *said* she delivered the soup to Lael," "*claimed* that although Lael's truck was there, he did not answer when she knocked" and "*said* she did not use her key to take the soup in because she thought Lael might be sleeping." [State's Brief, 23 (emphasis added).] The State also points out that the trial court "acknowledged that Petitioner's evidentiary testimony must be viewed with some skepticism." [State's Brief, 23 (internal quotation marks omitted).]

[89] The majority concedes that "there is potentially some room to doubt the court's finding that Ms. Brown firmly established her whereabouts, even accepting the court's credibility findings." *Supra* ¶ 69 n.69. But it argues that the clear and convincing evidentiary standard tolerates such doubt. *Supra* ¶ 69 n.69.

As the majority notes, however, this evidentiary burden requires evidence that makes a conclusion "very highly probable." *Supra* ¶ 69 n.69 (internal quotation marks omitted). And I struggle to see how Ms. Brown's evidence does so, as it fails to establish an alibi—the only reason that her whereabouts are even relevant. She put herself at the scene of the crime during a time when that crime might have been committed. And it accordingly does not matter that there is only a narrow window of time during which she might have committed the murder, that there is some contrary evidence suggesting that the murder may have been committed during another time, or that the State has not proved that the murder occurred while she was there. Ms. Brown is the one who bore the burden of proof—of demonstrating her factual innocence by clear and convincing

(continued...)

¶118   I would thus read the State's briefs to properly preserve an analysis of the merits of the district court's factual innocence determination even assuming acceptance by the State of the district court's findings regarding the timing of Lael Brown's death and regarding Debra Brown's accounts of her whereabouts.

II

¶119   We should accordingly reach the merits of the State's challenge to the district court's determination that Ms. Brown met her burden of proving her factual innocence. I would do so under the clear error standard of review, and would reverse.

¶120 As the majority notes, the determination of factual innocence in this case was premised on two subsidiary factual findings: (1) that "Lael Brown was alive Saturday afternoon," and (2) that "[Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, ha[d] been firmly established." *Supra* ¶ 55 (first alteration in original) (internal quotation marks omitted). And because those questions are factual ones—given that they "entail[] the empirical,

---

(...continued)

evidence—at the factual innocence hearing. And because she put herself at the scene of the crime during a time when the murder might have been committed, she failed to do so.

Even assuming that the time of death was later in the day, as the medical examiner testified it might have been, *supra* ¶ 24 (explaining that the time of death was likely between 9:00 p.m. and 3:00 a.m.), Ms. Brown's "alibi" for portions of this later time period still amounted to a mere denial of guilt. That, again, is no alibi. And it is not clear and convincing proof of factual innocence. Ms. Brown claimed she had fallen asleep at 8:00 or 8:30 p.m. at her boyfriend's home, slept until about midnight, and then drove herself home, where she claimed to have remained for the rest of the night. Thus, even assuming that Lael Brown was killed in the evening, Ms. Brown was alone for an appreciable part of the time period during which the murder might have occurred. And it was her son—who perjured himself at trial—who provided the only corroboration that she arrived home shortly after midnight. Thus, the fact that Ms. Brown placed herself at the scene of the crime during a time when the murder might have been committed is not the only deficiency in her alibi. If the doubt afforded under the clear and convincing standard allows an alibi as weak as Ms. Brown's to stand as proof of factual innocence, we have created a very low hurdle indeed.

such as things, events, actions, or conditions happening, existing, or taking place"—they are reviewed for clear error. *See Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 40, __ P.3d __ (alteration in original) (internal quotation marks omitted).

¶121   And in my view the State has easily carried its burden on appeal. I would conclude that the trial court clearly erred in making at least one, and perhaps both, of the subsidiary factual determinations on which its finding of factual innocence rested.[90]

B

¶122   The first of these determinations—that Ms. Brown proved by clear and convincing evidence that Lael Brown was alive at *some* point on Saturday afternoon—is not incontrovertible. *Supra* ¶¶ 82–83. Despite some doubts, however, I see the propriety of that finding to be a close issue. The propriety of the second determination, however, is not such a close call. It is obvious that the trial court clearly erred by determining that Ms. Brown had—by clear and convincing evidence—conclusively established an alibi during the relevant time period (the period during which the murder could have occurred).

¶123 That relevant time period—according to the trial court—was "10:00 a.m. on Saturday afternoon until Sunday morning at 3:00 a.m." The trial court noted that Ms. Brown had given the following explanation of her whereabouts during the time:

> At approximately 10:00 a.m. on Saturday, [Ms. Brown's] son Ryan Buttars saw his mother when he awoke. Shortly thereafter, at approximately 10:20 a.m., Brent Skabelund, who was [Ms. Brown's] boyfriend at the time, arrived at her home to accompany her to her son's basketball game at Skyview High School in Smithfield. They left for the game at approximately 10:40 or 10:45 a.m. From 11:00 a.m. to 12:15 p.m., [Ms. Brown] and Skabelund watched the basketball game. Following the game, she

---

[90] Even the majority recognizes that these factual conclusions are not unassailable. It notes "[w]e readily recognize the existence of evidence in this case that calls into question the post-conviction court's factual findings. And we agree with the State that the court's ultimate determination of factual innocence is not *the only* reasonable conclusion to be drawn from the evidence." *Supra* ¶ 63 (internal quotation marks omitted).

and Skabelund stopped at R&G's, a local drive-in, for lunch. After lunch, Skabelund took her to her house where she took a nap. Between 2:00 and 3:00 p.m. [she] delivered chicken soup to Lael's house, possibly her daughter's house as well, and then went to a new store at the Pine Crest shopping area. She then went back home and called Skabelund around 4:00 p.m. At 4:30 p.m., Skabelund drove to [Ms. Brown's] home, and together they went shopping at Macey's grocery store. They then went back to [Ms. Brown's] home to put away the groceries at approximately 5:40 p.m. and had pizza for dinner that [her] sons brought home. Skabelund stayed at [Ms. Brown's] residence until 6:45 p.m., and then they both drove to Skabelund's house to watch movies. They arrived there around 7:00 p.m. [Ms. Brown] fell asleep at 8:00 or 8:30 p.m. while she was watching the movie and slept until midnight. At midnight she awoke and drove herself home. After arriving home she saw her two sons who were playing video games. [She] went to bed shortly after midnight Sunday morning. Buttars indicated that his mother stayed at home the rest of the night.

¶124　Based on the foregoing chronology, and because in its view "[n]o evidence was presented to suggest that [this] account of [Ms. Brown's] whereabouts [was] inaccurate," the trial court ultimately found by "clear and convincing evidence that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, ha[d] been firmly established," such that "she could not have killed Lael during the" relevant time period "when the murder could have occurred."

¶125　This is clear error. The consideration of Ms. Brown's whereabouts is relevant only as part of her "alibi." And even assuming *arguendo* that Lael Brown was alive for some portion of the

afternoon,[91] Ms. Brown still lacks a plausible—let alone a compelling—alibi.

¶126 An "alibi" is "[a] defense based on the physical impossibility of a defendant's guilt" because the "defendant [was] in a location other than the scene of the crime at the relevant time." BLACK'S LAW DICTIONARY 84 (9th ed. 2009). Ms. Brown's "defense" comes nowhere close. First, her establishment of her whereabouts in no way demonstrates "impossibility." Unlike the classic alibi involving indisputable, objective evidence of the suspect's whereabouts, Ms. Brown's evidence was subjective and self-serving.[92] The witnesses who vouched for her whereabouts during critical portions of the day were all close friends or family members—people who had a significant motive to lie for her, *supra* ¶ 86.[93]

---

[91] Review of the trial court's discussion shows that the only witness that the trial court found credible (Dale Hall) saw Lael Brown during the "early afternoon hours on Saturday, November 6th." At one point Hall said he saw Lael Brown at 1:00 p.m., and at another point at 2:30 p.m. Even assuming Hall was alive at *both* of those times, however, Ms. Brown's alibi is still unpersuasive. After all, she went to Lael Brown's house, by her own admission, between 2:00 and 3:00 (and was alone until 4:00), and there was no other testimony—including that by Carlsen, an individual previously "convicted of tampering with a witness"—that was, by itself, "sufficiently credible to establish by clear and convincing evidence that Lael was alive" at any time after 2:30 p.m. In fact, the trial court itself noted its "confidence" in the truthfulness of Carlsen's testimony was "low," such that his testimony was "not entitled to a significant amount of weight."

[92] I of course agree that alibis are always "self-serving," *supra* ¶ 70, in the sense of advancing the cause of the defense. But they are not always based on a defendant's (or her family members') simple denial of being present at the scene of the crime. A classic alibi involves objective evidence—a photograph, a hotel receipt, or the testimony of an objective third-party. This case involves nothing of the sort. It involves mere denials by the defendant and by her loved-ones. And even they—she—placed Ms. Brown at the scene of the crime at a time when it could have been committed.

[93] One of them, her son, did in fact lie for her, perjuring himself at her earlier trial. *See supra* ¶ 62 n.49. And he is the sole witness as to Ms. Brown's whereabouts late in the evening on Saturday and early

(continued...)

¶127   More fundamentally, during at least the "chicken soup" trip, and perhaps during other times, she was completely alone and, worse, *by her own admission, at the scene of the crime*. This is no alibi. It is only a self-serving explanation for *why* she was at the scene of the crime (i.e., delivering chicken soup) and thus constitutes no more than a denial.

¶128   That cannot possibly be enough to rise to the level of clear and convincing proof of factual innocence under the law. The district court's decision must accordingly be reversed; otherwise the "factual innocence" bar in Utah will be set at an impossibly low level.

III

¶129   The grounds on which the majority rests its decision were never asserted by Ms. Brown in her briefs or at oral argument. And the court's opinion today is thus handed down without the benefit of any input from the State through the adversary process. We owe the parties more in a case of this (or any) magnitude. We should decide this important case on its merits. And we should reverse under the law, even if that decision runs counter to the outcome seemingly dictated by our human compassion for a sympathetic party like Ms. Brown.

_____

(...continued)
in the morning on Sunday.